## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| PHILIP ANGUS, MARK WIEDDER, TANIA GARCIA, EDWARD BURDICK, RAY HARTER, DANIELLE MEIS, JONTHAN KELLEY, RYAN MARTIN, ARTHUR DORE, ANN KELLY, and KEITH KELLY,<br><br>on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br>vs.<br><br>FLAGSTAR BANK, FSB,<br>a Michigan-based federally chartered stock savings bank,<br><br>        Defendant. | Case No.: 2:21-cv-10657-AJT-DRG<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Philip Angus, Mark Wiedder, Tania Garcia, Edward Burdick, Ray Harter, Danielle Meis, Jonathan Kelley, Ryan Martin, Arthur Dore, Ann Kelly, and Keith Kelly ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Class Action Complaint against Flagstar Bank, FSB ("Defendant"), and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

### I. INTRODUCTION

1.    Plaintiffs bring this class action against Defendant for its failure to

1

properly secure and safeguard personally identifiable information that Defendant stored on and/or shared using its vendor's "legacy" file sharing platform, including, without limitation, names, Social Security numbers, home addresses, phone numbers, dates of birth, and/or financial account numbers (collectively, "personally identifiable information" or "PII").[1]

2.     According to its website, Defendant "has assets of $31.0 billion, is the sixth largest bank mortgage originator nationally, and the second largest savings bank in the country."[2]  Defendant "operate[s] 150 branches in Michigan, Indiana, California, Wisconsin, and Ohio and provide[s] a full complement of products and services for consumers and businesses."[3]  Its "mortgage division operates nationally through 103 retail locations and a wholesale network of approximately 2,350 third-party mortgage originators."[4]

3.     Defendant's customers entrust Defendant with an extensive amount of

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 CFR § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number).

[2] *See* https://www.flagstar.com/about-flagstar.html (last visited June 8, 2021).

[3] *Id.*

[4] *Id.*

their PII.  Defendant retains this information on computer hardware—even after the customer relationship ends.  Defendant asserts that it understands the importance of protecting such information and "is committed to maintaining the security of the data you provide us."[5] Its policy and promise to its customers includes "[t]o protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings."[6]

4.      On or before January 22, 2021, Accellion, Inc., a vendor that Defendant used for its file sharing platform ("Accellion FTA"), informed Defendant that an unauthorized actor had exploited a vulnerability in Accellion FTA, which Defendant used to store and/or share the PII of Plaintiffs and Class Members (the "Data Breach").

5.      On or before March 6, 2021, Defendant learned that, during the Data Breach, the unauthorized actor removed one or more documents that contained the PII of Plaintiffs and Class Members, including, but not limited to, names, Social Security numbers, home addresses, phone numbers, dates of birth, and/or financial account numbers.

---

[5] https://www.flagstar.com/legal-disclaimers/privacy-statement.html (last visited June, 9, 2021).

[6] https://www.flagstar.com/content/dam/flagstar/pdfs/about-flagstar/PrivacyPolicy.pdf (last visited June, 9, 2021).

6.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs'
and Class Members' PII, Defendant assumed legal and equitable duties to those
individuals, including the duty to protect and safeguard their PII.

7.     The exposed PII of Plaintiffs and Class Members can be sold on the
dark web.  Hackers can access and then offer for sale the unencrypted, unredacted
PII to criminals.  Plaintiffs and Class Members face a lifetime risk of identity theft,
which is heightened here by the loss of Social Security numbers.

8.     This PII was compromised due to Defendant's negligent and/or careless
acts and omissions and the failure to protect PII of Plaintiffs and Class Members.

9.     Plaintiffs bring this action on behalf of all persons whose PII was
compromised as a result of Defendant's failure to: (i) adequately protect the PII of
Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of its
inadequate information security practices; and (iii) avoid sharing the PII of Plaintiffs
and Class Members without adequate safeguards.  Defendant's conduct amounts to
negligence and violates federal and state statutes.

10.     Plaintiffs and Class Members have suffered injury as a result of
Defendant's conduct. These injuries include: (i) lost or diminished value of PII; (ii)
out-of-pocket expenses associated with the prevention, detection, and recovery from
identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity
costs associated with attempting to mitigate the actual consequences of the Data

Breach, including but not limited to lost time, and significantly (iv) the continued and increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

11.    Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class Members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As the result, the PII of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## II. PARTIES

12.    Plaintiff Philip Angus is a citizen of Florida residing in St. Johns County, Florida.

13.    Plaintiff Mark Wiedder is a citizen of California residing in Orange County, California.

14.     Plaintiff Tania Garcia is a citizen of New Jersey residing in Jamesburg, New Jersey.

15.     Plaintiff Edward Burdick is a citizen of Indiana residing in Angola, Indiana.

16.     Plaintiff Ray Harter is a citizen of Missouri residing in St. Louis, Missouri.

17.     Plaintiff Danielle Meis is a citizen of Nevada residing in Las Vegas, Nevada.

18.     Plaintiff Jonathan Kelley is a citizen of Montana residing in Missoula County, Montana.

19.     Plaintiff Ryan Martin is a citizen of Pennsylvania residing in East Petersburg, Pennsylvania.

20.     Plaintiff Arthur Dore is a citizen of Michigan residing in Detroit, Michigan.

21.     Plaintiff Ann Kelly is a citizen of Michigan residing in Allenton, Michigan.

22.     Plaintiff Keith Kelly is a citizen of Michigan residing in Allenton, Michigan.

23.     Defendant Flagstar Bank, FSB is a Michigan-based federally chartered stock savings bank, headquartered at 5151 Corporate Drive, Troy, Michigan.

24.    The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiffs.  Plaintiffs will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

25.    All of Plaintiffs' claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

### III. JURISDICTION AND VENUE

26.    This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one other Class Member is a citizen of a state different from Defendant to establish minimal diversity.

27.    The Eastern District of Michigan has personal jurisdiction over Defendant named in this action because Defendant is headquartered in this District and Defendant conducts substantial business in Michigan and this District through its headquarters, offices, parents, and affiliates.

28.    Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant and/or its parents or affiliates are headquartered in this District and a

substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### *Background*

29.     Defendant used Accellion FTA to store and/or share some of Plaintiffs' and Class Members most sensitive and confidential information, including names, Social Security numbers, home addresses, phone numbers, dates of birth, financial account numbers, and other personal identifiable information.  Notably, much of the information is static, does not change, and can be used to commit myriad financial crimes.

30.     Plaintiffs and Class Members relied on this sophisticated Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members demand security to safeguard their PII and that Defendant live up to its promises to protect and safeguard their PII.

31.     Defendant had a duty to adopt reasonable measures to protect Plaintiffs' and Class Members' PII from involuntary disclosure to third parties.

### *The Data Breach*

32.     On or around March 15, 2021, Defendant sent Plaintiffs and Class

Members a *Notice of Data Breach*.[7]  Defendant generally[8] informed Plaintiffs and

Class Members as follows:

### *What Happened?*

Accellion, a vendor that Flagstar uses for its file sharing platform, informed Flagstar on January 22, 2021 that the platform had a vulnerability that was exploited by an unauthorized party. Flagstar permanently discontinued use of this file sharing platform. Unfortunately, we have learned that the unauthorized party was able to access some of Flagstar's information on the Accellion platform – and that we are one of numerous Accellion clients who were impacted.

Flagstar remains fully operational and other parts of our IT infrastructure outside of the Accellion platform were not impacted. Importantly, the Accellion platform was segmented from the rest of our network, and our core banking and mortgage systems were not affected.

### *What We Are Doing.*

Upon learning of the vulnerability, Flagstar promptly took the Accellion server offline and permanently discontinued use of this file sharing platform. Additionally, we acted immediately to contain the threat and engaged a team of third-party forensic experts to investigate and determine the full scope of this incident. As part of our investigation, we     have     also     notified     law     enforcement.

### *What Information Was Involved?*

---

[7] *See Notice of Data Breach* sent to Plaintiff Angus, a true and correct copy of which is attached hereto as Exhibit 1 ("Ex. 1").

[8] The *Notice of Data Breach* varies as to whether data elements other than Social Security number were exposed, such as account number.

On March 6, 2021, we determined that one or more of the documents removed from the Accellion platform contained your Social Security Number, First Name, Last Name, Phone Number, Address.

**_What You Can Do._**

Out of an abundance of caution we have secured the services of Kroll to provide identity monitoring at no cost to you for two years. Kroll is a global leader in risk mitigation and response, and their team has extensive experience helping people who have sustained an unintentional exposure of confidential data. Your identity monitoring services include Credit Monitoring, Fraud Consultation, and Identity Theft Restoration. Additional information describing your services is included with this letter.[9]

33.     On or about March 12, 2021, Defendant notified various state Attorneys General of the Data Breach.  Defendant also provided the Attorneys General with "sample" notices of the Data Breach that suggest the information exposed in the Data Breach is not limited to names, Social Security numbers, home addresses and phone numbers, but may also include dates of birth and/or financial account numbers.[10]

34.     Defendant admitted in the _Notice of Data Breach_, the letters to the

---

[9] _Id._ at 1-2.

[10] _See_ Letter to Attorney General of New Hampshire dated March 12, 2021, a true and correct copy of which is attached hereto as Exhibit 2 ("Ex. 2"); Sample Notice of Data Breach provided to Attorney General of California, a true and correct copy of which is attached hereto as Exhibit 3 ("Ex. 3")

1

Attorneys General, and the "sample" notices of the Data Breach that an unauthorized party accessed one or more documents that contained sensitive information about Defendant's current and former customers, including names, Social Security numbers, home addresses, and phone numbers and potentially including dates of birth and financial account numbers.

35.    In response to the Data Breach, Defendant claims that it "promptly took the Accellion server offline and permanently discontinued use of this file sharing platform. Additionally, we acted immediately to contain the threat and engaged a team of third-party forensic experts to investigate and determine the full scope of this incident."[11]   However, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure a breach does not occur again have not been shared with regulators or Plaintiffs and Class Members, who retain a vested interest in ensuring that their information remains protected.

36.    On May 18, 2021, Accellion announced that 75% of its customers impacted by the exploitation of the vulnerability in Accellion FTA had migrated to another Accellion product known as "Kiteworks."[12]   Accellion emphasized that

---

[11] Exs. 1, 3.

[12] *See* https://www.accellion.com/company/press-releases/accellion-fta-customers-migrate-to-kiteworks-to-protect-their-most-sensitive-data/ (last visited June 8, 2021).

Accellion FTA was a "legacy" product and that Kiteworks was "superior" to FTA. Accellion further asserted that Kiteworks, unlike Accellion FTA, was a "modern, secure" platform for protecting third-party communications.

37.     Given the "legacy" status of Accellion FTA and the superiority of Kiteworks in protecting third-party communications, Defendant should have migrated to Kiteworks or another superior solution before the Data Breach occurred.

38.     Instead, Defendant continued to use Accellion FTA to share and/or store the PII of Class Members, notwithstanding its "legacy" status and the availability of a "superior" alternative that would have better protected Plaintiffs' and Class Members' PII.

39.     Defendant's continued use of Accellion FTA, despite the availability of a superior and more secure alternative, resulted in criminals exfiltrating the Social Security numbers and other PII of more than 1.4 million individuals, including Plaintiff and Class Members.

40.     Plaintiffs' and Class Members' unencrypted information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members.  Unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

41.     Defendant did not use reasonable security procedures and practices

1

appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiffs and Class Members, causing their PII to be exposed.

***Defendant Acquires, Collects and Stores Plaintiffs' and Class Members' PII.***

42.    Defendant acquired, collected, and stored Plaintiffs' and Class Members' PII.

43.    As a condition of providing services to its customers, Defendant requires that its customers entrust Defendant with highly confidential PII.

44.    At all times relevant to this Complaint, Plaintiffs and Class Members were customers of Defendant (or persons who became customers of Defendant through acquisition of their mortgages by Defendant) who entrusted their highly confidential PII (including Social Security numbers) to Defendant and later learned that their PII was compromised in the Data Breach.

45.    By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

46.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

*Securing PII and Preventing Breaches*

47.    Defendant could have prevented this Data Breach by properly securing and encrypting the PII of Plaintiffs and Class Members.  Alternatively, Defendant could have destroyed the data, especially decade-old data from former customers.

48.    Defendant's negligence in safeguarding the PII of Plaintiffs and Class Members is bewildering given the repeated warnings and alerts about the need to protect and secure sensitive data.

49.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members.

50.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[13] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[14]

---

[13] 17 C.F.R. § 248.201 (2013).

[14] *Id.*

1

51.    The ramifications of Defendant's failure to keep secure the PII of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### *Value of Personal Identifiable Information*

52.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.  For example, one source reports that personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[15] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[16] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[17]

53.    Social Security numbers, for example, are among the worst kind of

---

[15] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed June 9, 2021).

[16] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed June 9, 2021).

[17] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed June 9, 2021).

personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[18]

54.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

55.     Even then, a new Social Security number may not be effective.

---

[18] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed June 9, 2021).

According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[19]

56.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—name, Social Security number, and potentially date of birth.

57.     This data demands a much higher price on the black market. According to Martin Walter, senior director at cybersecurity firm RedSeal, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[20]

---

[19] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last accessed June 9, 2021).

[20] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed June 9, 2021).

58.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

59.     The PII of Plaintiffs and Class Members was taken by hackers to engage in identity theft or to sell it to other criminals who will purchase the PII for that purpose.  The fraudulent activity resulting from the Data Breach may not come to light for years.

60.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[21]

61.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members and of the foreseeable consequences that would occur if the PII was compromised,

---

[21] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/products/gao-07-737 (last accessed June 9, 2021).

including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members a result.

62.     Plaintiffs and Class Members now face years of constant monitoring of their financial and personal records and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

63.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's file servers, potentially more than 1.4 million individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

64.     To date, Defendant has offered Plaintiffs and Class Members only two years of identity monitoring through a single provider, Kroll. The offered service is inadequate to protect Plaintiffs and Class Members from the threats they will face for years to come, particularly in light of the nature of the PII disclosed here.

65.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

### *Defendant Violated the Gramm-Leach-Bliley Act*

66.     Defendant is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and

thus is subject to the GLBA.

67. The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

68. Defendant collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Defendant was subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1 et seq., and is subject to numerous rules and regulations promulgated on the GLBA statutes.

69. The GLBA Privacy Rule became effective on July 1, 2001. See 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

70. Accordingly, Defendant's conduct is governed by the Privacy Rule prior to December 30, 2011, and by Regulation P after that date.

71. Both the Privacy Rule and Regulation P require financial institutions to provide customers with an initial and annual privacy notice. These privacy notices

2

must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendant violated the Privacy Rule and Regulation P.

72.    Defendant failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and storing and/or sharing that PII on Accellion FTA.

73.    Defendant failed to adequately inform its customers that it was storing and/or sharing, or would store and/or share, the customers' PII on Accellion FTA and would do so after the customer relationship ended.

74.     The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4. As alleged herein, Defendant violated the Safeguard Rule.

75.     Defendant failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of customer information.

76.     Defendant failed to adequately (a) oversee Accellion and Accellion

FTA and (b) require Accellion by contract to protect the security and confidentiality of customer information.

77.    As of January 4, 2019, Defendant's "Policies and Procedures" for "Compliance" recognized that the GLBA "prohibits financial institutions from sharing the non-public personal information of consumers with non-affiliated third parties except in certain circumstances."

78.    As of January 4, 2019, Defendant further recognized the GLBA required it to (a) "[p]rovide an opt-out notice prior to sharing non-public personal information with non-affiliated third parties" and (b) "[p]rovide customers with a 'reasonable opportunity' to opt out before disclosing non-public personal information about them to non-affiliated third parties."

79.    As of January 4, 2019, Defendant admitted that it had not provided Plaintiffs or Class Members an opt-opt notice, stating it "does not currently share non-public personal information with non-affiliated third parties; therefore, it is not required to and does not provide an opt-out notice."

80.    Defendant violated the GLBA and its own policies and procedures by sharing the PII of Plaintiffs and Class Members using Accellion FTA without providing Plaintiffs and Class Members (a) an opt-out notice and (b) a reasonable opportunity to opt out of such disclosure.

81.    Defendant has not informed Plaintiffs and Class Members of the reason

Defendant shared the PII of more than 1.4 million individuals using Accellion FTA; if this was done to share the PII with a non-affiliated third party, Defendant would be further in breach of the GLBA and its own policy and procedures in failing to provide Plaintiffs and Class Members an opt-out notice and a reasonable opportunity to opt out of such disclosure.

### Plaintiff Philip Angus's Experience

82.    In 2014, Plaintiff Angus obtained a residential mortgage loan from Defendant. In connection with his loan application, Plaintiff Angus provided financial and other highly sensitive information to Defendant, including his Social Security Number.

83.    Plaintiff Angus's last loan payment to Defendant was in or around October 2015, when Plaintiff Angus began making loan payments to a different entity.  More than five years after the customer relationship with Defendant ended, Defendant stored and/or shared some of Plaintiff Angus's most sensitive (and extremely valuable to cyber criminals and identity thieves) PII using Accellion FTA, resulting in the exposure of Plaintiff Angus's PII during the Data Breach.

84.    On or around March 15, 2021, Plaintiff Angus learned of the Data Breach via the *Notice of Data Breach* that Defendant sent to Plaintiff Angus on or around that date.

85.     Since January 2021, Plaintiff Angus has experienced an increase in the volume of "spam" calls he receives, despite being on the "do not call" list.

86.     As a result of learning of the Data Breach, Plaintiff Angus spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the news reports of the Data Breach, exploring credit monitoring and identity theft insurance options, and self-monitoring his financial accounts. This time has been lost forever and cannot be recaptured.

87.     Additionally, Plaintiff Angus is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

88.     Plaintiff Angus stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

89.     Plaintiff Angus suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Angus entrusted to Defendant as a customer, which was compromised in and as a result of the Data Breach.

90.     Plaintiff Angus suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

2

91.     Plaintiff Angus has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, in combination with his name and Social Security number being placed in the hands of unauthorized third-parties and possibly criminals.

92.     Plaintiff Angus has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Mark Wiedder's Experience*

93.     In approximately 2011, Plaintiff Wiedder refinanced his residential mortgage loan using Defendant's services. In connection with his loan application, Mr. Wiedder provided financial and other highly sensitive information to Defendant, including his Social Security number.

94.     On or about March 5, 2021, Plaintiff Wiedder learned of the Data Breach via an email from Defendant.  On or about March 15, 2021, Plaintiff Wiedder received Defendant's *Notice of Data Breach* that informed Plaintiff Wiedder that his name and Social Security number had been compromised.

95.     On or about March 18, 2021, Plaintiff Wiedder's debit card was used by an unauthorized third party to make unauthorized purchases for a total of $96.00.

96.     Moreover, since January 2021, Plaintiff Wiedder and his spouse have experienced an increase in the volume of "spam" calls they receive.

97.     As a result of learning of the Data Breach and the subsequent fraudulent charges, Plaintiff Wiedder spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the news reports of the Data Breach, exploring credit monitoring and identity theft insurance options, self-monitoring his financial accounts, filing an identity theft affidavit with a government agency, signing up for Defendant's complimentary credit monitoring services, and monitoring those services on a regular basis. This time has been lost forever and cannot be recaptured.

98.     Additionally, Plaintiff Wiedder is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

99.     Plaintiff Wiedder stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

100.   Plaintiff Wiedder suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Wiedder entrusted to Defendant as a customer, which was compromised in and as a result of the Data Breach.

2

101. Plaintiff Wiedder suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

102. Plaintiff Wiedder has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, in combination with his name being placed in the hands of unauthorized third-parties and possibly criminals.

103. Plaintiff Wiedder has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Tania Garcia's Experience*

104. In 2016, Plaintiff Garcia obtained a residential mortgage loan from Defendant. In connection with her loan application, Plaintiff Garcia provided financial and other highly sensitive information to Defendant, including her Social Security number.

105. In late January 2021, Plaintiff Garcia received a notice from her Credit Karma account regarding a potential data breach in January 2021. On or around March 22, 2021, Plaintiff Garcia started to piece together that the Credit Karma alert was related to Defendant and the Data Breach.

106.   As a result of learning of the Data Breach, Plaintiff Garcia has spent time dealing with the consequences of the Data Breach which includes time spent monitoring news reports to verify the legitimacy of the reports of the Breach, spending time daily checking her Credit Karma, self-monitoring her financial accounts, and reviewing various email communications she has received since February 1, 2021 from Apple regarding multiple attempted sign-in attempts using her Apple ID, and having to contact Apple to unlock her username after being informed by Apple that her username was being used by a third party.

107.   Additionally, Plaintiff Garcia is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

108.   Plaintiff Garcia stores any documents containing her PII in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

109.   Plaintiff Garcia suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that Plaintiff Garcia entrusted to Defendant as a customer, which was compromised in and as a result of the Data Breach.

110.   Plaintiff Garcia suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach including the repeated communications

with Apple regarding her username as well as having to contact her bank to dispute and obtain reimbursement for unauthorized account charges at two retailers. Based on the issues with Apple and her bank which occurred after the Breach and has anxiety and increased concerns for the loss of her privacy.

111.   Plaintiff Garcia has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially her Social Security number, in combination with her name being placed in the hands of unauthorized third-parties and possibly criminals.

112.   Plaintiff Garcia has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Edward Burdick's Experience

113.   In June 2018, Plaintiff Burdick obtained a residential mortgage loan from Defendant.  In connection with his loan application, Plaintiff Burdick provided financial and other highly sensitive information to Defendant, including his Social Security number.

114.   On or around March 15, 2021, Plaintiff Burdick learned of the Data Breach via the *Notice of Data Breach* that Defendant sent to Plaintiff Burdick on or around that date.[22]

---

[22] Exhibit 4 (*Notice of Data Breach* sent to Plaintiff Burdick).

115.   As a result of learning of the Data Breach and the subsequent fraudulent charges, Plaintiff Burdick spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the news reports of the Data Breach, exploring credit monitoring and identity theft insurance options, self-monitoring his financial accounts, signing up for Defendant's complimentary credit monitoring services, and monitoring those services on a regular basis. This time has been lost forever and cannot be recaptured.

116.   Additionally, Plaintiff Burdick is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

117.   Plaintiff Burdick stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

118.   Plaintiff Burdick suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Burdick entrusted to Defendant as a customer, which was compromised in and as a result of the Data Breach.

119.   Plaintiff Burdick suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

3

120.   Plaintiff Burdick has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, in combination with his name being placed in the hands of unauthorized third-parties and possibly criminals.

121.   Plaintiff Burdick has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Ray Harter's Experience

122.   In or before 2000, Plaintiff Harter obtained a residential mortgage loan from Defendant.  In connection with his loan application, Plaintiff Harter provided financial and other highly sensitive information to Defendant, including his Social Security Number.

123.   Plaintiff Harter's last loan payment to Defendant was in or around 2001, when Mr. Harter began making loan payments to a different entity.  Plaintiff Harter paid off his mortgage loan in 2019.  The Data Breach occurred almost twenty years after the customer relationship with Defendant ended, and more than one year after Plaintiff Harter paid off his mortgage loan.

124.   On or around March 15, 2021, Plaintiff Harter learned of the Data Breach via the *Notice of Data Breach* that Defendant sent to Plaintiff Harter on or around that date.

3

125.   As a result of learning of the Data Breach and the subsequent fraudulent charges, Plaintiff Harter spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the news reports of the Data Breach and self-monitoring his financial accounts.  This time has been lost forever and cannot be recaptured.

126.   Additionally, Plaintiff Harter is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

127.   Plaintiff Harter stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

128.   Plaintiff Harter suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Harter entrusted to Defendant as an acquired customer, which was compromised in and as a result of the Data Breach.

129.   Plaintiff Harter suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

130.   Plaintiff Harter has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting

from his PII, especially his Social Security number, in combination with his name being placed in the hands of unauthorized third-parties and possibly criminals.

131.   Plaintiff Harter has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Danielle Meis' Experience

132.   In June 2016, Plaintiff Meis, then a resident of Victorville, California, obtained a residential mortgage loan from Defendant.  In connection with her loan application, Plaintiff Meis provided financial and other highly sensitive information to Defendant, including her Social Security number.

133.   On or around March 15, 2021, Plaintiff Meis learned of the Data Breach via the *Notice of Data Breach* that Defendant sent to Plaintiff Meis on or around that date.

134.   As a result of learning of the Data Breach, Plaintiff Meis spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the news reports of the Data Breach, exploring credit monitoring and identity theft protection options, signing up for credit monitoring, and self-monitoring her financial accounts. This time has been lost forever and cannot be recaptured.

135.   Additionally, Plaintiff Meis is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

136.   Plaintiff Meis stores any documents containing her sensitive PII in a safe and secure location or destroys the documents.  Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

137.   Plaintiff Meis suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that Plaintiff Meis entrusted to Defendant as a customer, which was compromised in and as a result of the Data Breach.

138.   Plaintiff Meis suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

139.   Plaintiff Meis has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially her Social Security number, in combination with her name being placed in the hands of unauthorized third-parties and possibly criminals.

140.   Plaintiff Meis has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

*Plaintiff Jonathan Kelley's Experience*

141.   In 2014, Plaintiff Kelley obtained a residential mortgage loan from Defendant. In connection with his loan application, Plaintiff Kelley provided financial and other highly sensitive information to Defendant, including his Social Security Number.

142.   Plaintiff Kelley continues to make loan payments to Defendant. Despite this ongoing relationship, Defendant stored and/or shared some of Plaintiff Kelley's most sensitive (and extremely valuable to cyber criminals and identity thieves) PII using Accellion FTA, resulting in the exposure of Plaintiff Kelley's PII during the Data Breach.

143.   On or around March 29, 2021, Plaintiff Kelley learned of the Data Breach via the *Notice of Data Breach* that Defendant sent to Plaintiff Kelley on or around that date.

144.   As a result of learning of the Data Breach, Plaintiff Kelley spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the news reports of the Data Breach, exploring credit monitoring and identity theft insurance options, and self-monitoring his financial accounts. This time has been lost forever and cannot be recaptured.

145.   Plaintiff Kelley takes his personal finances very seriously. Since the Data Breach, he has spent an increased time monitoring his accounts and finances

3

and has spent hours attempting to obtain credit monitoring without providing his Social Security Number and other PII to Kroll, the company hired by Defendant to provide such resources. He does not trust the company hired by Defendant because he no longer trusts Defendant to adequately protect his PII.

146.   Plaintiff Kelley also believes the two-year credit monitoring is inadequate. When he asked the Kroll representative what happens if his PII is misused and his identity stolen in two and a half years, he was informed that he would just be out of luck.

147.   Plaintiff Kelley suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Kelley entrusted to Defendant as a customer, which was compromised in and as a result of the Data Breach.

148.   Plaintiff Kelley suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

149.   Plaintiff Kelley has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, in combination with his name and Social Security number being placed in the hands of unauthorized third-parties and possibly criminals.

150.   Plaintiff Kelley has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Ryan Martin's Experience*

151.   Plaintiff Martin refinanced his home in late October/early November 2020. The refinancing company he used forced him to use Defendant as a mortgage provider. In connection with his loan application, Plaintiff Martin provided financial and other highly sensitive information to Defendant, including his Social Security Number.

152.   Defendant stored and/or shared some of Plaintiff Martin's most sensitive (and extremely valuable to cyber criminals and identity thieves) PII using Accellion FTA, resulting in the exposure of Plaintiff Martin's PII during the Data Breach.

153.   On or around March 15, 2021, Plaintiff Martin learned of the Data Breach via the *Notice of Data Breach* that Defendant sent to Plaintiff Martin on or around that date.

154.   Since January 2021, Plaintiff Martin has experienced an increase in the volume of "spam" calls he receives. Some of these spam calls are particularly frightening, as the spammers tell Plaintiff Martin personal information about himself as a method of attempting to appear legitimate.

3

155.   In January or February 2021, Santander Bank put a freeze on a credit card owned by Plaintiff Martin and had to issue him a new one. When Plaintiff Martin asked the reason, the bank informed him it was because of a data breach.

156.   As a result of learning of the Data Breach, Plaintiff Martin spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the news reports of the Data Breach, exploring credit monitoring and identity theft insurance options, and self-monitoring his financial accounts. Mr. Martin spends at least double the time monitoring his financial accounts as he did before the Data Breach. This time has been lost forever and cannot be recaptured.

157.   Plaintiff Martin suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Mr. Martin entrusted to Defendant as a customer, which was compromised in and as a result of the Data Breach.

158.   Plaintiff Martin suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

159.   Plaintiff Martin has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, in combination with his name

and Social Security number being placed in the hands of unauthorized third-parties and possibly criminals.

160. Plaintiff Martin has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Arthur Dore's Experience*

161. On or about September 15, 2020, Plaintiff Dore obtained a residential mortgage loan from Defendant. In connection with his loan application, Plaintiff Dore provided financial and other highly sensitive information to Defendant, including his Social Security number.

162. On or around March 15, 2021, Plaintiff Dore learned of the Data Breach via the *Notice of Data Breach* that Defendant sent to Plaintiff Dore on or around that date.[23]

163. As a result of learning of the Data Breach, Plaintiff Dore spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the news reports of the Data Breach, exploring credit monitoring and identity theft protection options, signing up for credit monitoring, self-monitoring his financial accounts, and spending time contacting his bank to

---

[23] Exhibit 5 (*Notice of Data Breach* sent to Plaintiff Dore).

close one checking account. This time has been lost forever and cannot be recaptured.

164.    Additionally, Plaintiff Dore is very careful about sharing his sensitive PII including the regular use of a VPN. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

165.    Plaintiff Dore stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

166.    Plaintiff Dore suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff Dore entrusted to Defendant as a customer, which was compromised in and as a result of the Data Breach.

167.    Plaintiff Dore suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of his privacy. These inconveniences have included receiving unsolicited text messages about refinancing his student loans which Plaintiff Dore had not previously received before the breach.

168.    Plaintiff Dore has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his

PII, especially her Social Security number, in combination with his name being placed in the hands of unauthorized third-parties and possibly criminals.

169.   Plaintiff Dore has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Ann Kelly's Experience

170.   In 2010, Plaintiff A. Kelly opened personal financial accounts including a checking account and savings account with the Defendant.  In connection with her loan application, Plaintiff A. Kelly provided financial and other highly sensitive information to Defendant, including her Social Security number.

171.   On or around March 15, 2021, Plaintiff A. Kelly learned of the Data Breach via the *Notice of Data Breach* that Defendant sent to Plaintiff A. Kelly on or around that date.

172.   As a result of learning of the Data Breach, Plaintiff A. Kelly spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the news reports of the Data Breach, exploring credit monitoring and identity theft protection options, signing up for credit monitoring, and self-monitoring her financial accounts. This time has been lost forever and cannot be recaptured.

173. Additionally, Plaintiff A. Kelly is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

174. Plaintiff A. Kelly stores any documents containing her sensitive PII in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

175. Plaintiff A. Kelly suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that Plaintiff A. Kelly entrusted to Defendant as a customer, which was compromised in and as a result of the Data Breach.

176. Plaintiff A. Kelly suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

177. Plaintiff A. Kelly has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially her Social Security number, in combination with her name being placed in the hands of unauthorized third-parties and possibly criminals.

178. Plaintiff A. Kelly has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Keith Kelly's Experience*

179.   In 2010, Plaintiff K. Kelly opened personal financial accounts including a checking account and savings account with the Defendant. In connection with his loan application, Plaintiff K. Kelly provided financial and other highly sensitive information to Defendant, including her Social Security number.

180.   On or around March 15, 2021, Plaintiff K. Kelly learned of the Data Breach via the *Notice of Data Breach* that Defendant sent to Plaintiff K. Kelly on or around that date.

181.   As a result of learning of the Data Breach, Plaintiff K. Kelly spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the news reports of the Data Breach, exploring credit monitoring and identity theft protection options, signing up for credit monitoring, and self-monitoring his financial accounts. This time has been lost forever and cannot be recaptured.

182.   Additionally, Plaintiff K. Kelly is very careful about sharing her sensitive PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

183.   Plaintiff K. Kelly stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

184. Plaintiff K. Kelly suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that Plaintiff K. Kelly entrusted to Defendant as a customer, which was compromised in and as a result of the Data Breach.

185. Plaintiff K., Kelly suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

186. Plaintiff K. Kelly has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially his Social Security number, in combination with his name being placed in the hands of unauthorized third-parties and possibly criminals.

187. Plaintiff K. Kelly has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V. CLASS ALLEGATIONS

188. Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

189. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

4

> All individuals residing in the United States whose PII was accessed during the security incident referenced in the Notice of Data Breach that Defendant sent to Plaintiffs and others on or around March 15-29, 2021 (the "Nationwide Class").

190. The Florida Subclass that Plaintiff Angus seeks to represent is defined as follows:

> All individuals residing in Florida whose PII was accessed during the security incident referenced in the Notice of Data Breach that Defendant sent to Plaintiffs and others on or around March 15-29, 2021 (the "Florida Subclass").

191. The New Jersey Subclass that Plaintiff Garcia seeks to represent is defined as follows:

> All individuals residing in New Jersey whose PII was accessed during the security incident referenced in the Notice of Data Breach that Defendant sent to Plaintiffs and others on or around March 15-29, 2021 (the "New Jersey Subclass").

192. The Indiana Subclass that Plaintiff Burdick seeks to represent is defined as follows:

> All individuals residing in Indiana whose PII was accessed during the security incident referenced in the Notice of Data Breach that Defendant sent to Plaintiffs and others on or around March 15-29, 2021 (the "Indiana Subclass").

193. The Pennsylvania Subclass that Plaintiff Martin seeks to represent is defined as follows:

> All individuals residing in Pennsylvania whose PII was accessed during the security incident referenced in the

> Notice of Data Breach that Defendant sent to Plaintiffs and others on or around March 15-29, 2021 (the "Pennsylvania Subclass").

194.   The California Subclass that Plaintiffs Wiedder and Meis seek to represent is defined as follows:

> All individuals residing in California whose PII was accessed during the security incident referenced in the Notice of Data Breach that Defendant sent to Plaintiffs and others on or around March 15-29, 2021 (the "California Subclass").

195.   The Michigan Subclass that Plaintiffs Dore, A. Kelly, and K. Kelly seek to represent is defined as follows:

> All individuals residing in Michigan whose PII was accessed during the security incident referenced in the Notice of Data Breach that Defendant sent to Plaintiffs and others on or around March 15-29, 2021 (the "Michigan Subclass").

196.   The Borrowers Subclass that Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore seek to represent is defined as follows:

> All individuals residing in the United States who borrowed money from Defendant, including through a mortgage or home equity loan, and whose PII was accessed during the security incident referenced in the Notice of Data Breach that Defendant sent to Plaintiffs and others on or around March 15-29, 2021 (the "Borrowers Subclass").

197.   The Banking Subclass that Plaintiffs A. Kelly and K. Kelly seek to represent is defined as follows:

4

All individuals residing in the United States who had a checking, savings, or other bank account with Defendant and whose PII was accessed during the security incident referenced in the Notice of Data Breach that Defendant sent to Plaintiffs and others on or around March 15-29, 2021 (the "Banking Subclass").

198.   Excluded from the Classes and Subclasses are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

199.   Plaintiffs reserve the right to modify or amend the definition of the proposed classes and subclasses before the Court determines whether certification is appropriate.

200.   <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): The Nationwide Class and Subclasses are so numerous that joinder of all members is impracticable. Defendant reported to the Attorney General of Maine that more than 1.4 million individuals were affected by the Data Breach.

201.   <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class and Subclasses exist and predominate over any questions

affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs and Class Members;

b. Whether Defendant had a duty not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant had a duty not to use the PII of Plaintiffs and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class Members;

e. Whether and when Defendant actually learned of the Data Breach;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

g. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiffs and Class Members;

i. Whether Plaintiffs and Class Members are entitled to actual, consequential, statutory, and/or nominal damages as a result of Defendant's wrongful conduct;

j.  Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

k.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

202.  <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendant's misfeasance.

203.  <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

204.  <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the

Members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

205.   <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

206.   The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable

advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

207.   The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

208.   Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

209.   Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members and may continue to act unlawfully as set forth in this Complaint.

210.   Further, Defendant has acted or refused to act on grounds generally applicable to the and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule

23(b)(2) of the Federal Rules of Civil Procedure.

211.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e. Whether Defendant breached the implied contract;

f. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiffs and Class Members; and,

i. Whether Plaintiffs and Class Members are entitled to actual, consequential, statutory, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
### Negligence
**(On Behalf of Plaintiffs and the Nationwide Class)**

212. Plaintiffs and the Nationwide Class re-allege and incorporate by reference paragraphs 1 to 211 as if fully set forth herein.

213. As a condition of being customers of Defendant, Defendant's current and former customers were obligated to provide Defendant with certain PII, including their names, Social Security numbers, home addresses, phone numbers, and dates of birth.

214. Plaintiffs and the Nationwide Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to

5

unauthorized third parties.

215.   Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Nationwide Class could and would suffer if the PII were wrongfully disclosed.

216.   Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Nationwide Class involved an unreasonable risk of harm to Plaintiffs and the Nationwide Class, even if the harm occurred through the criminal acts of a third party.

217.   Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the PII of Plaintiffs and the Nationwide Class in Defendant's possession was adequately secured and protected.

218.   Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII it was no longer required to retain pursuant to regulations.

219.   Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiffs and the Nationwide

Class.

220.   Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and the Nationwide Class.   That special relationship arose because Plaintiffs and the Nationwide Class entrusted Defendant with their confidential PII, a necessary part of being customers of Defendant.

221.   Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Nationwide Class.

222.   A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Nationwide Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

223.   Plaintiffs and the Nationwide Class were the foreseeable and probable victims of any inadequate security practices and procedures.   Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Nationwide Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

224.   Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and the Nationwide Class. Defendant's misconduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein.   Defendant's misconduct also included its decisions not to comply

5

with industry standards for the safekeeping of the PII of Plaintiffs and the Nationwide Class, including basic encryption techniques freely available to Defendant.

225. Plaintiffs and the Nationwide Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

226. Defendant was in a position to protect against the harm suffered by Plaintiffs and the Nationwide Class as a result of the Data Breach.

227. Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiffs and the Nationwide Class.

228. Defendant has admitted that the PII of Plaintiffs and the Nationwide Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

229. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and the Nationwide Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiffs and the Nationwide Class during the time the PII was within Defendant's possession or control.

230. Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Nationwide Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

5

231.   Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiffs and the Nationwide Class in the face of increased risk of theft.

232.   Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and the Nationwide Class by failing to have appropriate procedures in place to detect and prevent dissemination of its current and former customers' PII.

233.   Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove former customers' PII it was no longer required to retain pursuant to regulations.

234.   But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Nationwide Class, the PII of Plaintiffs and the Nationwide Class would not have been compromised.

235.   There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Nationwide Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Nationwide Class.  The PII of Plaintiffs and the Nationwide Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

236.   Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices

5

in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

237.   Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Nationwide Class.

238.   Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

239.   Defendant's duty to use reasonable security measures also arose under the GLBA, under which Defendant was required to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

240.   Defendant violated the GLBA, its Privacy Rule and/or Regulation P, and its Safeguards Rule by (a) failing to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and

storing and/or sharing that PII on Accellion FTA, (b) failing to adequately inform its customers that it was storing and/or sharing, or would store and/or share, the customers' PII on Accellion FTA and would do so after the customer relationship ended, (c) failing to assess reasonably foreseeable risks to the security, confidentiality, and integrity of customer information, (d) failed to adequately (i) oversee its Accellion and Accellion FTA and (ii) require Accellion by contract to protect the security and confidentiality of customer information, and (e) failing to send opt-out notices and afford a reasonable opportunity to opt out of disclosures before sharing the PII of more than 1.4 million individuals with one or more non-affiliated third parties.

241.   Defendant's violation of the GLBA, its Privacy Rule and/or Regulation P, and its Safeguards Rule constitutes negligence *per se*.

242.   Plaintiffs and the Nationwide Class are within the class of persons that the FTC Act and the GLBA were intended to protect.

243.   The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Nationwide Class.  The GLBA, with its Privacy Rule, Regulation P, and Safeguards Rule, was similarly intended to guard

against harms such as the harm that occurred as a result of the Data Breach.

244.  As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and the Nationwide Class; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Nationwide Class.

245.  As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will

continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

246. Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

247. As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

## COUNT II
### Breach of Implied Contract
### (On Behalf of Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass)

248. Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass re-allege and incorporate by reference paragraphs 1 to 211 as if fully set forth herein.

249. When Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass provided their PII to Defendant in exchange for Defendant's financial services and products, they entered

into implied contracts with Defendant under which—and by mutual assent of the parties after a meeting of the minds—Defendant agreed to take reasonable steps to protect the PII of Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass.

250.   Defendant solicited and invited Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass to provide their PII as part of Defendant's regular business practices and as essential to the financial services and products offered. Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass accepted Defendant's offers by providing their PII to Defendant in connection with the purchase of financial services and products from Defendant.

251.   Defendant agreed to protect and safeguard the PII of Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass and prevent it from being disclosed or accessed by unauthorized third parties.

252.   Defendant required Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass to provide their personal information, including names, Social Security numbers, home addresses, phone numbers, and other personal information, as a condition of being customers of Defendant.  Defendant may have also required Plaintiffs Angus, Wiedder, Garcia,

Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass to provide their dates of birth and financial account information as a condition of being customers of Defendant.

253.   As a condition of being customers of Defendant, Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass provided their personal and financial information.  In so doing, Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information and to keep such information secure and confidential.

254.   Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass value data security and would not have provided their PII to Defendant in the absence of Defendant's implied promise to keep the PII reasonably secure.

255.   Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass fully performed their obligations under the implied contracts with Defendant.

256.   Defendant breached the implied contracts it made with Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the

Borrowers Subclass by failing to safeguard and protect their personal and financial information.

257.   As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

258.   As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, and Dore and the Borrowers Subclass are entitled to recover actual, consequential, and nominal damages.

## COUNT III
### Breach of Implied Contract
### (On Behalf of Plaintiffs A. Kelly and K. Kelly and the Banking Subclass)

259.   Plaintiffs A. Kelly and K. Kelly and the Banking Subclass re-allege and incorporate by reference paragraphs 1 to 211 as if fully set forth herein.

260.   When Plaintiffs A. Kelly and K. Kelly and the Banking Subclass provided their PII to Defendant in exchange for Defendant's financial services and products, they entered into implied contracts with Defendant under which—and by mutual assent of the parties after a meeting of the minds—Defendant agreed to take reasonable steps to protect the PII of Plaintiffs A. Kelly and K. Kelly and the Banking Subclass.

261.   Defendant solicited and invited Plaintiffs A. Kelly and K. Kelly and the Banking Subclass to provide their PII as part of Defendant's regular business practices and as essential to the financial services and products offered. Plaintiffs A. Kelly and K. Kelly and the Banking Subclass accepted Defendant's offers by providing their PII to Defendant in connection with the purchase of financial services and products from Defendant.

262.   Defendant agreed to protect and safeguard the PII of Plaintiffs A. Kelly and K. Kelly and the Banking Subclass and prevent it from being disclosed or accessed by unauthorized third parties.

263. Defendant required Plaintiffs A. Kelly and K. Kelly and the Banking Subclass to provide their personal information, including names, Social Security numbers, home addresses, phone numbers, and other personal information, as a condition of being customers of Defendant. Defendant may have also required Plaintiffs A. Kelly and K. Kelly and the Banking Subclass to provide their dates of birth and financial account information as a condition of being customers of Defendant.

264. As a condition of being customers of Defendant, Plaintiffs A. Kelly and K. Kelly and the Banking Subclass provided their personal and financial information. In so doing, Plaintiffs A. Kelly and K. Kelly and the Banking Subclass entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information and to keep such information secure and confidential.

265. Plaintiffs A. Kelly and K. Kelly and the Banking Subclass value data security and would not have provided their PII to Defendant in the absence of Defendant's implied promise to keep the PII reasonably secure.

266. Plaintiffs A. Kelly and K. Kelly and the Banking Subclass fully performed their obligations under the implied contracts with Defendant.

267.   Defendant breached the implied contracts it made with Plaintiffs A. Kelly and K. Kelly and the Banking Subclass by failing to safeguard and protect their personal and financial information.

268.   As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs A. Kelly and K. Kelly and the Banking Subclass have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

269.   As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs A. Kelly and K. Kelly and the Banking Subclass are entitled to recover actual, consequential, and nominal damages.

6

**COUNT IV**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Nationwide Class)**

270.    Plaintiffs and the Nationwide Class re-allege and incorporate by reference paragraphs 1 to 211 as if fully set forth herein.

271.    Plaintiffs and the Nationwide Class had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

272.    Defendant owed a duty to its current and former customers, including Plaintiffs and the Nationwide Class, to keep their PII contained as a part thereof, confidential.

273.    Defendant failed to protect and released to unknown and unauthorized third parties the PII of Plaintiffs and the Nationwide Class.

274.    Defendant allowed unauthorized and unknown third parties access to and examination of the PII of Plaintiffs and the Nationwide Class, by way of Defendant's failure to protect the PII.

275.    The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiffs and the Nationwide Class is highly offensive to a reasonable person.

276.   The unauthorized release to, custody of, and examination by unauthorized third parties of the PII of Plaintiffs and the Nationwide Class is of no legitimate concern to the public.

277.   The intrusion was into a place or thing, which was private and is entitled to be private.  Plaintiffs and the Nationwide Class disclosed their PII to Defendant as part of the current and former customers' relationship with Defendant, but privately with an intention that the PII would be kept confidential and would be protected from unauthorized disclosure. Plaintiffs and the Nationwide Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

278.   The Data Breach at the hands of Defendant constitutes an intentional interference with Plaintiffs' and the Nationwide Class's interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

279.   Defendant acted with a knowing state of mind when it permitted the Data Breach to occur because it was with actual knowledge that its information security practices were inadequate and insufficient.

280.   Because Defendant acted with this knowing state of mind, it had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and the Nationwide Class.

7

281.   As a proximate result of the above acts and omissions of Defendant, the PII of Plaintiffs and the Nationwide Class was disclosed to third parties without authorization, causing Plaintiffs and the Nationwide Class to suffer damages.

282.   Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Nationwide Class in that the PII maintained by Defendant can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiffs and the Nationwide Class have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and the Nationwide Class.

283.   As a direct and proximate result of Defendant's invasion of privacy, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

## COUNT V
### Breach of Confidence
### (On Behalf of Plaintiffs and the Nationwide Class)

284.   Plaintiffs and the Nationwide Class re-allege and incorporate by reference paragraphs 1 to 211 as if fully set forth herein.

285.   At all times during Plaintiffs' and the Nationwide Class's interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature

of Plaintiffs' and the Nationwide Class's PII that Plaintiffs and the Nationwide Class provided to Defendant.

286.   As alleged herein and above, Defendant's relationship with Plaintiffs and the Nationwide Class was governed by terms and expectations that Plaintiffs' and the Nationwide Class's PII would be collected, stored, and protected in confidence, and would not be disclosed to unauthorized third parties.

287.   Plaintiffs and the Nationwide Class provided their PII to Defendant with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to any unauthorized third parties.

288.   Plaintiffs and the Nationwide Class also provided their PII to Defendant with the explicit and implicit understandings that Defendant would take precautions to protect that PII from unauthorized disclosure.

289.   Defendant voluntarily received in confidence the PII of Plaintiffs and the Nationwide Class with the understanding that PII would not be disclosed or disseminated to the public or any unauthorized third parties.

290.   Due to Defendant's failure to prevent and avoid the Data Breach from occurring, the PII of Plaintiffs and the Nationwide Class was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and the Nationwide Class's confidence, and without their express permission.

291.  As a direct and proximate cause of Defendant's actions and/or omissions, Plaintiffs and the Nationwide Class have suffered damages.

292.  But for Defendant's disclosure of Plaintiffs' and the Nationwide Class's PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties.  The Data Breach was the direct and legal cause of the theft of Plaintiffs' and the Nationwide Class's PII as well as the resulting damages.

293.  The injury and harm Plaintiffs and the Nationwide Class suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs' and the Nationwide Class's PII.  Defendant knew or should have known its methods of accepting and securing Plaintiffs' and the Nationwide Class's PII was inadequate as it relates to, at the very least, securing servers and other equipment containing Plaintiffs' and the Nationwide Class's PII.

294.  As a direct and proximate result of Defendant's breach of its confidence with Plaintiffs and the Nationwide Class, Plaintiffs and the Nationwide Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort

expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of current and former customers; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Nationwide Class.

295.   As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and the Nationwide Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

296.   As a direct and proximate result of Defendant's breaches of confidence, Plaintiffs and the Nationwide Class are entitled to recover actual, consequential, and nominal damages.

## COUNT VI
## Unjust Enrichment
### (On Behalf of Plaintiffs and the Nationwide Class)

297.   Plaintiffs and the Nationwide Class re-allege and incorporate by reference paragraphs 1 to 211 as if fully set forth herein.

298.   Plaintiffs and the Nationwide Class conferred a monetary benefit on Defendant in the form of monies or fees paid for services from Defendant. Defendant had knowledge of this benefit when it accepted the money from Plaintiffs and the Nationwide Class.

299.   The monies or fees paid by Plaintiffs and the Nationwide Class were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiffs and the Nationwide Class.

300.   Defendant failed to provide reasonable security, safeguards, and protections to the personal data of Plaintiffs and the Nationwide Class, instead storing and/or sharing the PII of Plaintiffs and the Nationwide Class using the outdated and vulnerable "legacy" Accellion FTA file transfer platform, which resulted in Plaintiffs and the Nationwide Class overpaying Defendant for the services they purchased.

301.   Defendant failed to disclose to Plaintiffs and the Nationwide Class that Accellion FTA was inadequate to safeguard the PII of Plaintiffs and the Nationwide Class against theft.

302.   Under principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and the Nationwide Class because Defendant failed to provide adequate safeguards and security measures to protect the PII of Plaintiffs and the Nationwide Class, who paid for such measures but did not receive them.

303.   Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiffs and the Nationwide Class.

304.   Defendant's enrichment at the expense of Plaintiffs and the Nationwide Class is and was unjust.

305.   As a result of Defendant's wrongful conduct, as alleged above, Plaintiffs and the Nationwide Class are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

**<u>COUNT VII</u>**
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**(Fla. Stat. §§ 501.201, *et seq.*)**
**(On Behalf of Plaintiff Angus and the Florida Subclass)**

306.   Plaintiff Angus and the Florida Subclass re-allege and incorporate by reference paragraphs 1 to 211 as if fully set forth herein.

7

307.   Defendant engaged in the conduct alleged in this Complaint through transactions in and involving trade and commerce.  Mainly, Defendant obtained the PII of Plaintiff Angus and the Florida Subclass through advertising, soliciting, providing, offering, and/or distributing goods and services to Plaintiff Angus and the Florida Subclass and the Data Breach occurred through the use of the internet, an instrumentality of interstate commerce.

308.   As alleged herein this Complaint, Defendant engaged in unfair or deceptive acts or practices in the conduct of consumer transactions, including, among other things, the following:

a.  failure to implement adequate data security practices to safeguard the PII of Plaintiff Angus and the Florida Subclass;

b.  failure to make only authorized disclosures of the PII of Plaintiff Angus and the Florida Subclass; and

c.  failure to disclose that its computer systems and data security practices were inadequate to safeguard the PII of Plaintiff Angus and the Florida Subclass from theft.

309.   Defendant's actions constitute unconscionable, deceptive, or unfair acts or practices because, as alleged herein, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are and were substantially injurious to its current and former customers.

310.   In committing the acts alleged above, Defendant engaged in unconscionable, deceptive, and unfair acts and practices acts by omitting, failing to disclose, or inadequately disclosing to its current and former customers that it did not follow industry best practices for the collection, use, and storage of the PII of Plaintiff Angus and the Florida Subclass.

311.   As a direct and proximate result of Defendant's conduct, Plaintiff Angus and the Florida Subclass have been harmed and have suffered damages including, but not limited to: damages arising from identity theft and fraud; out-of-pocket expenses associated with procuring identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; and time spent monitoring, addressing and correcting the current and future consequences of the Data Breach.

312.   As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices alleged herein, Plaintiff Angus and the Florida Subclass have been damaged and are entitled to recover actual damages, an order providing declaratory and injunctive relief, and reasonable attorneys' fees and costs, to the extent permitted by law.

313.   Also as a direct result of Defendant's knowing violation of the Florida Unfair and Deceptive Trade Practices Act, Plaintiff Angus and the Florida Subclass are entitled to damages as well as injunctive relief, including, but not limited to:

a.      Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.      Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

c.      Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

d.      Ordering that Defendant segment PII by, among other things, creating firewalls and access controls so that if one area of Defendant is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.      Ordering that Defendant purge, delete, and destroy in a reasonably secure manner PII not necessary for its provisions of services;

f.      Ordering that Defendant conduct regular database scanning and securing checks;

7

g.      Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

h.      Ordering Defendant to meaningfully educate its current and former customers about the threats they face as a result of the loss of their PII to third parties, as well as the steps Defendant's current and former customers must take to protect themselves; and

i.      requiring Defendant to thoroughly and regularly evaluate any vendor's or third-party's technology that allows or could allow access to PII and to promptly migrate to superior or more secure alternatives.

## COUNT VIII
### Violation of N.J.S.A. § 56:8-2, The Consumer Fraud Act
### (On behalf of Plaintiff Garcia and the New Jersey Subclass)

314.   Plaintiff Garcia and the New Jersey Subclass re-allege and incorporate by reference paragraphs 1 to 211 as if fully set forth herein.

315.   The New Jersey Consumer Fraud Act ("CFA") prohibits:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate.

N.J.S.A. § 56:8-2.

316.   The term "unconscionable" under the CFA implies a lack of good faith, honesty in fact and observance of fair dealing.

317.   Defendant committed an "unconscionable commercial practice" by failing to use reasonable measures, as interpreted and enforced by the FTC, to protect the PII of Plaintiff Garcia and the New Jersey Subclass.

318.   Defendant's acts and practices were unconscionable given the nature and amount of PII it stores and the foreseeable consequences of the immense damages that would result to Plaintiff Garcia and the New Jersey Subclass by failing to follow reasonable procedures to safeguard their PII.

319.   The gravity of the harm to Plaintiff Garcia and the New Jersey Subclass resulting from these unlawful acts and practices outweighed any conceivable reasons, justifications, and/or motives that Defendant had—in this case the desire to save money by not using industry standard practices in protecting the PII entrusted to it—for engaging in such deceptive acts and practices. By committing the acts and practices alleged above, Defendant engaged in unlawful business practices within the meaning of the CFA, N.J.S.A. § 56:8-1, et seq.

320.   Unlawful conduct under the CFA includes "deception, fraud, false pretense, false promise, misrepresentation."

321.   As set forth above, Defendant committed deception, fraud, false pretenses, false promises, or misrepresentations about its data security. Defendant's representations were made with the intent to generate public good will and to induce consumers, such as Plaintiff Garcia and the New Jersey Subclass, to reasonably rely on those representations and choose Defendant when making a decision about who to entrust their PII to.

322.   Defendant's acts and practices as described herein deceived Plaintiff Garcia and the New Jersey Subclass and were highly likely to deceive members of the consuming public. Plaintiff Garcia and the New Jersey Subclass would not have entrusted their PII to Defendant had they been aware that Defendant would unconscionably and unfairly fail to safeguard her PII.  Had Plaintiff Garcia and the New Jersey Subclass entrusted their PII to a different bank, their PII would not have been exposed due to Defendant's reckless and intentional acts. Accordingly, Plaintiff Garcia and the New Jersey Subclass have suffered ascertainable loss as a direct result of Defendant's practices described above.

**COUNT IX**
**Violation of the Indiana Deceptive Consumer Sales Act,**
**Ind. Code § 24-5-0.5**
**(On behalf of Plaintiff Burdick and the Indiana Subclass)**

323.   Plaintiff Burdick and the Indiana Subclass re-allege and incorporate by reference paragraphs 1 to 211 as if fully set forth herein.

8

324.   The Indiana Deceptive Consumer Sales Act ("IDCSA") "shall be liberally construed and applied to promote its purposes and policies," which include "protect[ing] consumers from suppliers who commit deceptive and unconscionable sales acts." Ind. Code § 24-5-0.5-1.

325.   The IDCSA defines a "supplier" as "[a] seller, lessor, assignor, or other person who regularly engages in or solicits consumer transactions, including … a manufacturer, wholesaler, or retailer, whether or not the person deals directly with the consumer." *Id.* § 24-5-0.5-2(a)(3)(A).

326.   Defendant is a "supplier" under the IDCSA.

327.   The IDCSA defines an "incurable deceptive act" as "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." *Id.* § 24-5-0.5-2(a)(8).

328.   The IDCSA regulates the conduct of suppliers, as follows:

> A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction.  Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction.  An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations.

*Id.* § 24-5-0.5-3(a).

329.   Defendant engaged in incurable deceptive acts under the IDCSA related to consumer transactions with Plaintiff Burdick and Indiana Subclass, as follows:

    a.   Waiting more than 50 days to notify Plaintiff Burdick and the Indiana Subclass of the Data Breach;

    b.   Failing to have appropriate security safeguards or controls in place to prevent exploitation of vulnerabilities within its system that implicated the security of the PII of Plaintiff Burdick and the Indiana Subclass;

    c.   Failing to encrypt the sensitive PII of Plaintiff Burdick and the Indiana Subclass, including their Social Security Numbers; and

    d.   Failing to timely migrate from the "legacy" Accellion FTA file transfer platform to an alternative that would have better secured the PII of Plaintiff Burdick and the Indiana Subclass.

330.   The IDCSA provides that "[a] person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater." *Id.* § 24-5-0.5-4(a).  Moreover, "[t]he court may increase damages for a willful deceptive act in an amount that does not exceed the greater of: (1)  three (3)

times the actual damages of the consumer suffering the loss;  or (2)  one thousand dollars ($1,000)." *Id.*

331.   The IDCSA provides that a senior consumer, defined as "an individual who is at least sixty (60) years of age," may recover treble damages for an incurable deceptive act. *Id.* §§ 24-5-0.5-2(a)(9), 24-5-0.5-4(i).

332.   Plaintiff Burdick and the Indiana Subclass are entitled to and demand recovery of the maximum statutory damages available under the IDCSA.

333.   Under IDCSA § 24-5-0.5-4(a), Plaintiff Burdick and the Indiana Subclass are entitled to and demand recovery of reasonable attorney fees.

## COUNT X
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law,**
**(73 P.S. §§ 202-1, et seq.)**
**(On Behalf of Plaintiff Martin and the Pennsylvania Subclass)**

334.   Plaintiff Martin and the Pennsylvania Subclass re-allege and incorporate by reference paragraphs 1 to 211 as if fully set forth herein.

335.   Defendant engaged in the conduct alleged in this Complaint through transactions in and involving trade and commerce. Mainly, Defendant obtained the PII of Plaintiff Martin and the Pennsylvania Subclass through trade or commerce directly or indirectly affecting Plaintiff Martin and the Pennsylvania Subclass and the Data Breach occurred through the use of the internet, an instrumentality of interstate commerce.

336.   As alleged herein this Complaint, Defendant engaged in unfair or deceptive acts or practices in the conduct of consumer transactions, including, among other things, the following:

a.      failure to implement adequate data security practices to safeguard PII;

b.      failure to make only authorized disclosures of current and former customers' PII; and

c.      failure to disclose that its computer systems and data security practices were inadequate to safeguard PII from theft.

337.   Defendant's actions constitute unconscionable, deceptive, or unfair acts or practices because, as alleged herein, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are and were substantially injurious to its current and former customers.

338.   In committing the acts alleged above, Defendant engaged in unconscionable, deceptive, and unfair acts and practices acts by omitting, failing to disclose, or inadequately disclosing to its current and former customers that it did not follow industry best practices for the collection, use, and storage of PII.

339.   As a direct and proximate result of Defendant's conduct, Plaintiff Martin and the Pennsylvania Subclass have been harmed and have suffered damages including, but not limited to: damages arising from identity theft and fraud; out-of-

8

pocket expenses associated with procuring identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; and time spent monitoring, addressing and correcting the current and future consequences of the Data Breach.

340.   As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices alleged herein, Plaintiff Martin and the Pennsylvania Subclass have been damaged and are entitled to recover actual damages, an order providing declaratory and injunctive relief, and reasonable attorneys' fees and costs, to the extent permitted by law.

341.   Also as a direct result of Defendant's knowing violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Plaintiff Martin and the Pennsylvania Subclass are entitled to damages as well as injunctive relief, including, but not limited to:

> a.     Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b.      Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

c.      Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

d.      Ordering that Defendant segment PII by, among other things, creating firewalls and access controls so that if one area of Defendant is compromised, hackers cannot gain access to other portions of Defendant's systems;

e.      Ordering that Defendant purge, delete, and destroy in a reasonable secure manner PII not necessary for its provisions of services;

f.      Ordering that Defendant conduct regular database scanning and securing checks;

g.      Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

h.      Ordering Defendant to meaningfully educate its current and former customers about the threats they face as a result of the loss of

their PII to third parties, as well as the steps Defendant's current and former customers must take to protect themselves; and

i.       requiring Defendant to thoroughly and regularly evaluate any vendor's or third-party's technology that allows or could allow access to PII and to promptly migrate to superior or more secure alternatives.

## COUNT XI
### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, *et seq.* – Unlawful Business Practices
### (On Behalf of Plaintiffs and the Nationwide Class, or, Alternatively, Plaintiffs Wiedder and Meis and the California Class)

342.  Plaintiffs and the Nationwide Class, or, alternatively, Plaintiffs Wiedder and Meis and the California Class, re-allege and incorporate by reference paragraphs 1 to 211 as if fully set forth herein.

343.  Defendant's unlawful business acts and practices as complained of herein violate California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (the "UCL").

344.  Specifically, Defendant engaged in unlawful business acts and practices by failing to establish adequate security practices and procedures as set forth above, by soliciting and gathering the PII of Plaintiffs and the Nationwide Class knowing that the information would not be adequately protected, and by storing the PII of Plaintiffs and the Nationwide Class in an unsecure electronic system, all in violation of California's data breach statute, Cal. Civ. Code § 1798.81.5, which

8

requires Defendant to undertake reasonable measures to safeguard the PII of Plaintiffs and the Nationwide Class, as well as the FTC Act, the GLBA, the Privacy Rule, Regulation P, and the Safeguards Rule.

345.   Defendant knew or should have known that its data security practices with respect to its computer systems were inadequate to safeguard the PII of Plaintiffs and the Nationwide Class and that, as a result, the risk of a data breach or theft was highly likely.  Defendant's unlawful practices and acts were negligent, knowing, and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Nationwide Class.

346.   As a direct and proximate result of Defendant's unlawful business acts and practices, Plaintiffs and the Nationwide Class suffered injury in fact and lost money or property, including but not limited to the loss of their legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as described above.

347.   In addition, Plaintiffs and the Nationwide Class have incurred and will continue to incur economic damages related to the Data Breach, including loss of time and money spent remedying the Data Breach, and the costs of credit monitoring, purchasing credit reports, and implementing credit freezes to prevent opening of unauthorized account, among others.

348.   Accordingly, Plaintiffs and the Nationwide Class seek relief under Cal. Bus. & Prof. Code § 17200, *et seq.*, including, but not limited to, restitution to Plaintiffs and the Nationwide Class of money or property that Defendant acquired by means of its unlawful business acts and practices, disgorgement of all profits Defendant received as a result of its unlawful business practices, declaratory relief, attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5, and injunctive or other equitable relief.

## COUNT XII
### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, *et seq.* – Unfair Business Practices
### (On Behalf of Plaintiffs and the Nationwide Class, or, Alternatively, Plaintiffs Wiedder and Meis and the California Class)

349.   Plaintiffs and the Nationwide Class, or, alternatively, Plaintiffs Wiedder and Meis and the California Class, re-allege and incorporate by reference paragraphs 1 to 211 as if fully set forth herein.

350.   Defendant's unfair business acts and practices as complained of herein violate California's UCL.

351.   Specifically, Defendant engaged in unfair business acts and practices by failing to establish adequate security practices and procedures, by soliciting and collecting the PII of Plaintiffs and the Nationwide Class, knowing that the information would not be adequately protected, and by storing the PII in an unsecure electronic system.   These unfair acts and practices were immoral, unethical,

9

oppressive, unscrupulous, unconscionable, and/or damaging to Plaintiffs and the Nationwide Class as they were likely to deceive them into believing their PII was securely stored when it was not.

352. Defendant's actions and practices constitute "unfair" business practices in violation of the UCL, because, among other things, the gravity of the harm to Plaintiffs and the Nationwide Class outweighs the utility of Defendant's conduct. This conduct includes Defendant's failure to adequately ensure the privacy, confidentiality, and security of the data Plaintiffs and the Nationwide Class entrusted to them and Defendant's failure to have adequate data security measures in place.

353. Specifically, Defendant engaged in unfair acts and practices by failing to enact adequate privacy and security measures and protect the PII of Plaintiffs and the Nationwide Class from unauthorized disclosure, release, data breaches, and theft. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and damaging to Plaintiffs and the Nationwide Class.

354. As a direct and proximate result of Defendant's unfair business practices and acts, Plaintiffs and the Nationwide Class were injured and lost money or property, including but not limited to the loss of their legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as described above.

355.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the PII of Plaintiffs and the Nationwide Class and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in the abovenamed unlawful business practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and the Nationwide Class.

356.    Accordingly, Plaintiffs and the Nationwide Class seek relief under Cal. Bus. & Prof. Code § 17200, et seq., including, but not limited to, restitution to Plaintiffs and the Nationwide Class of money or property that Defendant may have acquired by means of its unfair business practices, disgorgement of all profits accruing to Defendant because of its unfair business practices, declaratory relief, attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5, and injunctive or other equitable relief.

357.    Plaintiffs and the Nationwide Class reserve the right to amend this Complaint as of right to seek damages and relief under Cal. Civ. Code § 1798.100, *et seq.*

## COUNT XIII
### Violation of the Michigan Consumer Protection Act,
### (Mich. Comp. Laws Ann. § 445.901 *et seq.*)
### (On Behalf of Plaintiffs Dore, A. Kelly, and K. Kelly and the Michigan Subclass)

358.   Plaintiffs Dore, A. Kelly, and K. Kelly and the Michigan Subclass re-allege and incorporate by reference paragraphs 1 to 211 as if fully set forth herein.

359.   Plaintiffs Dore, A. Kelly, and K. Kelly and the Michigan Subclass are "persons" as defined by Mich. Comp. Laws Ann. § 445.903(d).

360.   Defendant advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

361.   Defendant engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including:

    a.    Representing that its goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws Ann. § 445.903(1)(c);

    b.    Representing that its goods and services are of a particular standard or quality if they are of another in violation of Mich. Comp. Laws Ann. § 445.903(1)(e);

c. Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws Ann. § 445.903(1)(bb); and

d. Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, in violation of Mich. Comp. Laws Ann. § 445.903(1)(cc).

362. Defendant's unfair, unconscionable, and deceptive practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect the PII of Plaintiffs Dore, A. Kelly, and K. Kelly and the Michigan Subclass, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of the PII of Plaintiffs Dore, A. Kelly, and K. Kelly and the Michigan Subclass, including duties imposed by the FTC Act, the GLBA, the Privacy Rule, Regulation P,

and the Safeguards Rule, which was a direct and proximate cause of the Data Breach;

d.     Misrepresenting that it would protect the privacy and confidentiality of the PII of Plaintiffs Dore, A. Kelly, and K. Kelly and the Michigan Subclass, including by implementing and maintaining reasonable security measures;

e.     Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of the PII of Plaintiffs Dore, A. Kelly, and K. Kelly and the Michigan Subclass, including duties imposed by the FTC Act, the GLBA, the Privacy Act, Regulation P, and the Safeguards Rule;

f.     Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure the PII of Plaintiffs Dore, A. Kelly, and K. Kelly and the Michigan Subclass; and

g.     Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of the PII of Plaintiffs Dore, A. Kelly, and K. Kelly and the Michigan Subclass, including duties imposed by the FTC Act, the GLBA, the Privacy Act, Regulation P, and the Safeguards Rule.

363.   Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' PII.

364.   Defendant intended to mislead Plaintiffs Dore, A. Kelly, and K. Kelly and the Michigan Subclass and induce them to rely on its misrepresentations and omissions.

365.   Defendant acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded the rights of Plaintiffs Dore, A. Kelly, and K. Kelly and the Michigan Subclass.

366.   As a direct and proximate result of Defendant's unfair, unconscionable, and deceptive practices, Plaintiffs Dore, A. Kelly, and K. Kelly and the Michigan Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Defendant as they would not have paid Defendant for goods and services or would have paid less for such goods and services but for Defendant's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their PII; and an increased, imminent risk of fraud and identity theft.

367.   Plaintiffs Dore, A. Kelly, and K. Kelly and the Michigan Subclass seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, restitution, injunctive relief, and any other relief that is just and proper.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court enter an Order:

A.   certifying the Nationwide Class, the Florida Subclass, the New Jersey Subclass, the Indiana Subclass, the Pennsylvania Subclass, the California Subclass, the Michigan Subclass, the Borrowers Subclass, and the Banking Subclass and appointing Plaintiffs and their Counsel to represent each such Class and Subclass;

B.   enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members;

C.   providing injunctive or other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i.   prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

9

ii. requiring Defendant to protect, including through encryption and other means, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

v. prohibiting Defendant from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by

9

such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.    requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.  requiring Defendant to conduct regular database scanning and securing checks;

xi.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.   requiring Defendant to routinely and continually conduct internal

1

training and education, and on an annual basis to inform internal

security personnel how to identify and contain a breach when it

occurs and what to do in response to a breach;

xiii.  requiring Defendant to implement a system of tests to assess its

respective employees' knowledge of the education programs

discussed in the preceding subparagraphs, as well as randomly and

periodically testing employees compliance with Defendant's

policies, programs, and systems for protecting personal identifying

information;

xiv.  requiring Defendant to implement, maintain, regularly review,

and revise as necessary a threat management program designed to

appropriately monitor Defendant's information networks for threats,

both internal and external, and assess whether monitoring tools are

appropriately configured, tested, and updated;

xv.   requiring Defendant to meaningfully educate all Class Members

about the threats that they face as a result of the loss of their

confidential personal identifying information to third parties, as well

as the steps affected individuals must take to protect themselves;

xvi.  requiring Defendant to implement logging and monitoring

programs sufficient to track traffic to and from Defendant's servers;

1

and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

  xvii. requiring Defendant to thoroughly and regularly evaluate any vendor's or third-party's technology that allows or could allow access to PII and to promptly migrate to superior or more secure alternatives;

D.    For an award of damages, including actual, consequential, statutory, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment and post-judgment interest on all amounts awarded; and,

G.    Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand that this matter be tried before a jury.

1

Date: June 14, 2021

Respectfully Submitted,

*/s/ John A. Yanchunis*
Michael N. Hanna (P81462)
**MORGAN & MORGAN, P.A.**
Attorney for Plaintiffs
2000 Town Center
Suite 1900
Southfield, MI 48075
Tel: (313) 251-1399
mhanna@forthepeople.com

John A. Yanchunis
Ryan D. Maxey
**MORGAN & MORGAN COMPLEX
LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505
jyanchunis@ForThePeople.com
rmaxey@ForThePeople.com

M. Anderson Berry
**CLAYEO C. ARNOLD,
A PROFESSIONAL LAW CORP.**
865 Howe Avenue
Sacramento, CA 95825
(916) 777-7777
aberry@justice4you.com

*Counsel for Plaintiffs Philip Angus, Mark
Wiedder, Ray Harter, and Danielle Meis*

Brian D. Flick (OH #0081605)**
DannLaw
P.O. Box 6031040
Cleveland, Ohio 44103
Phone: (216) 373-0539
Fax: (216) 373-0536

notices@dannlaw.com

Terence R. Coates*
Zachary C. Schaengold*
Markovits, Stock & DeMarco, LLC
3825 Edwards Road, Suite 650
Cincinnati, OH 45209
Phone: (513) 651-3700
Fax: (513) 665-0219
tcoates@msdlegal.com
zschaengold@msdlegal.com

Bryan L. Bleichner*
Chestnut Cambronne PA
100 Washington Avenue South, Suite 1700
Minneapolis, MN 55401
Telephone: (612) 339-7300
bbleichner@chestnutcambronne.com

*Counsel for Plaintiffs Tania Garcia, Jonathan Kelley, Ryan Martin, Arthur Dore, Ann Kelly, and Keith Kelly*

Jeffrey S. Goldenberg*
Todd B. Naylor*
GOLDENBERG SCHNEIDER, L.P.A
4445 Lake Forest Drive, Suite 490
Cincinnati, OH 45242
Tel: (513) 345-8291
Email: jgoldenberg@gs-legal.com
         tnaylor@gs-legal.com

Gary E. Mason*
MASON LIETZ & KLINGER LLP
5301 Wisconsin Avenue, NW
Suite 305
Washington, DC 20016
Tel: (202) 429-2290
Email: gmason@masonllp.com
         dlietz@masonllp.com

1

Gary M. Klinger*
MASON LIETZ & KLINGER LLP
227 W. Monroe Street, Suite 2100
Chicago, IL 60630
Tel.: (312) 283-3814
Email: gklinger@masonllp.com

Charles E. Schaffer*
David C. Magagna Jr.*
LEVIN, SEDRAN & BERMAN, LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (212) 592-1500
Email: cschaffer@lfsblaw.com
        dmagagna@lfsblaw.com

*Counsel for Plaintiff Edward Burdick*

\* Denotes Applications for Admission pending or to be filed
\*\* Mr. Flick also represents *Plaintiff Edward Burdick*

1

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that on June 14, 2021, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*/s/ John A. Yanchunis*

John A. Yanchunis