Exhibit B

## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| PHILIP ANGUS, MARK WIEDDER, TANIA GARCIA, EDWARD BURDICK, RAY HARTER, DANIELLE MEIS, JONTHAN KELLEY, RYAN MARTIN, ARTHUR DORE, ANN KELLY, KEITH KELLY, RANDY MONIZ, HOLLY RINGLING, JOHN SCOTT SMITH, CHRISTOPHER P. KENNEDY, RAFAEL HERNANDEZ, WILLIAM WORTON, HASSAN NASRALLAH, NATHAN SILVA, LAURIE EWING SCANLON, EVERETT TURNER, and ALLIE MCLAUGHLIN, on behalf of themselves and all others similarly situated, | Case No.: 2:21-cv-10657-MFL-DRG<br><br>Hon. Matthew F. Leitman |
|         Plaintiffs,<br>vs.<br><br>FLAGSTAR BANK, N.A., f/k/a FLAGSTAR BANK, FSB, a Michigan-based federally chartered stock savings bank,<br><br>        Defendant. | |

## JOINT DECLARATION OF PROPOSED CLASS COUNSEL IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND TO DIRECT NOTICE OF PROPOSED SETTLEMENT TO THE CLASS

Norman E. Siegel and John A. Yanchunis declare as follows:

1.      Norman E. Siegel is a partner at Stueve Siegel Hanson LLP. John A. Yanchunis is a partner at Morgan & Morgan Complex Litigation Group. We are Interim Co-Lead Counsel for Plaintiffs in the above-captioned matter and have invested significant time investigating and litigating the claims in this Action.

2.      We submit this declaration in support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement.[1] This declaration explains the basis for the Settlement, including the significant relief it affords the Settlement Class. We have personal knowledge of the facts in this declaration and could testify to them if called on to do so.

## I.      INTRODUCTION

3.      As detailed in our leadership applications in this case, we have led some of the country's most complex civil litigation; have been recognized by courts and national publications for our knowledge and experience in data breach cases; and are responsible for groundbreaking data breach settlements, including in *Equifax*, *Capital One, Home Depot*, *Anthem*, *Yahoo!*, *T-Mobile, Office of Personnel Management,* and *Target*. The Court has previously reviewed our qualifications in

---

[1] Unless otherwise stated, all capitalized terms have the same meaning here as they do in the Settlement Agreement.

2

connection with our leadership applications,[2] but a brief summary of our experience as it relates to this case may be helpful to the Court.

### A.    Norman E. Siegel

4.    Since the revelation of the Target data breach in late 2013, Mr. Siegel has dedicated much of his practice to representing victims of data breaches. He co-founded the American Association for Justice's Consumer Privacy and Data Breach Litigation Group and previously served as the group's co-chair. He is a nationally published author on emerging issues impacting data breach cases, and he regularly speaks on data breach litigation issues and best practices in settling data breach cases. In recent years, *Law360* recognized Mr. Siegel as a "Cybersecurity and Privacy MVP of the Year" and a "Titan of the Plaintiff's Bar," and *Best Lawyers* named him "Lawyer of the Year" for his work in data breach litigation.

5.    Over the past decade, Mr. Siegel has led or substantively participated in nearly every major consumer data breach case on record, including serving as court-appointed co-lead counsel in multi-district litigation involving mega-breach cases such as *Target* (110 million class members), *Home Depot* (56 million class members), *T-Mobile* (76 million class members), *Equifax* (149 million class members), *Capital One* (98 million class members) and *Quest Diagnostics* (11.5

---

[2] *See* Order Appointing Interim Lead Counsel, ECF No. 33; Order Granting Motions to Appoint Interim Lead Counsel in *In re Flagstar December 2021 Data Security Incident Litig.*, Case No. 22-cv-11385, ECF No. 45 (May 24, 2023).

million class members). In addition, Mr. Siegel has worked alongside leadership in several other large data breach MDLs, including serving as a member of the plaintiffs' steering committee leading the briefing committee in *Marriott* (383 million class members), in *Anthem* (80 million class members) and in *Office of Personnel Management* (21 million class members) where Stueve Siegel Hanson represented a significant percentage of the named plaintiffs and handled other critical components of the litigation, including drafting large portions of the successful standing appeal before the United States Court of Appeals for the D.C. Circuit.

6.      In *Equifax*, *Capital One*, *T-Mobile*, and *Home Depot*, Mr. Siegel led the settlement negotiations, obtaining historic settlements, including the settlement in *Equifax* which Judge Thrash endorsed as being "the direct result of all counsel's experience, reputation, and ability in complex class actions including the evolving field of privacy and data breach class actions." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *33 (N.D. Ga. Mar. 17, 2020). Mr. Siegel also negotiated the $190 million settlement in the *Capital One* litigation and has served as lead counsel and crafted settlements in smaller data breach cases, including *Hutton v. National Board of Examiners in Optometry, Inc.*, No. 16-cv-03025-JKB (D. Md.), where he resolved a data breach case impacting 60,000 eye doctors across the country, which the court found provided "multiple beneficial forms of relief [and] . . . reflects an outstanding result for the Class." *Id.*

at *6. This settlement occurred after the plaintiffs were successful on appeal to the Fourth Circuit in obtaining a reversal of the district court's order dismissing the case for lack of Article III standing.

### B.    John A. Yanchunis

7.    Mr. Yanchunis's practice in the privacy arena stretches back decades, beginning in 1999 with the filing of *In re Doubleclick Inc. Privacy Litigation*, 154 F. Supp. 497 (S.D.N.Y. 2001), which alleged privacy violations based on the placement of cookies on hard drives of internet users. Beginning in 2003, he served as co-lead counsel in the successful prosecution and settlement of privacy class action cases involving the protection of privacy rights arising from the misuse of information of more than 200 million consumers under the Driver's Protection Privacy Act against the world's largest data and information brokers, including Experian, R.L. Polk, Acxiom, and Reed Elsevier (which owns Lexis/Nexis). *See Fresco v. Auto. Directions, Inc*., No. 03-cv-61063 and *Fresco v. R.L. Polk,* No. 07-cv-60695 (S.D. Fla.).

8.    Mr. Yanchunis served, by appointment of Judge Lucy Koh, as lead counsel in perhaps the largest class action lawsuit in history: *In re: Yahoo! Customer Data Security Breach Litigation*, No. 16-md-02752-LHK (N.D. Cal.), which at inception included some over 1 billion Yahoo user accounts. He also serves, or has served, in leadership positions in the following data privacy related Multidistrict

cases: *In re: Capital One Consumer Data Security Breach Litigation,* No. 1:19-MD-2915-AJT (E.D. Va.) (Co-Lead Counsel, settlement for $190,000,000 approved for 98 million consumers); *In Re: Equifax, Inc. Customer Data Security Breach Litigation*, 1:17-md-2800-TWT (N.D. Ga.) (member of the Plaintiffs' Steering Committee) (final approval of $380.5 million fund); *In re: U.S. Office of Personnel Management Data Security Breach Litigation*, 1:15-mc-01394-ABJ (D.D.C.) ("OPM") (member of the Executive Committee) (dismissal on standing grounds recently reversed on appeal to the D.C. Circuit); *In re The Home Depot, Inc. Consumer Data Sec. Data Breach Litig*., No. 1:14-md-02583-TWT (N.D. Ga.) (co-Lead Counsel) (final judgment entered approving a settlement on behalf of a class of 40 million consumers with total value of $29,025,000); and *In re Target Corp. Customer Data Sec. Breach Litig*., MDL No. 2522 (D. Minn.) (Executive Committee member) (final judgment approving a settlement on behalf of a class of approximately 100 million consumers upheld by the 8th Circuit), amongst others. Mr. Yanchunis also litigated and successfully resolved the Facebook data breach case, including achieving certification of a litigated class, in *Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686 (N.D. Cal. 2019).

9.      Mr. Yanchunis has also been appointed co-lead counsel in a data privacy case that was certified as a class over Google's opposition, *Brown. et al., v. Google, LLC,* No. 20-cv-03664 (N.D. Cal.). The case was settled weeks before the

commencement of trial, and final approval was granted in 2024.  In another data privacy case against Google pending in the Northern District of California, San Francisco Division, *Rodriguez, et al, v. Google, LLC,* No. 20-cv-04688 (N.D. Cal.), he, along with his co-counsel, were appointed as co-lead counsel for a class certified over Google's opposition, took the matter to trail beginning in August 2025, and received a successful verdict of $425 million.

10.     Throughout 2023, as a thought leader in the area of data privacy, Mr. Yanchunis lead a team of lawyers in his firm and obtained reversals of lower courts in the Eleventh Circuit and the Second Circuit Courts of Appeals in: *Bohnak v. Marsh & McLennan Companies,* No. 22-319 (2d Cir. 2023), *Ramirez v. The Paradies Shops, LLC,* No. 22-12853-HH (11th Cir. 2023), and *Sheffler v. Americold Realty Trust,* No. 22-11789-CC (11th Cir. 2023). On December 7, 2023, he presented argument before the Fourth Circuit in the successful appeal of a lower court decision in *Ford v. Sandhills Medical Ctr., Inc*., No.22-2268 (4th Cir. 2023), cert denied (2025), a class case arising out of a data breach at a health care facility.

11.     Proposed Class Counsel's collective experiences on the forefront of litigating and resolving data breach cases were brought to bear on the approach to prosecuting and settling the claims presented in this case. Based on these experiences, it is our shared view that the Settlement presented here is an excellent

result for the Settlement Class. Thus, we are confident that this Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

12.     Accordingly, we respectfully submit that proposed Class Counsel are well qualified and have diligently served the class and the Court in litigating this case and presenting this Settlement for initial approval and requesting issuance of notice and therefore request that we be appointed as Class Counsel pursuant to Fed. R. Civ. P. Rule 23(g) for purposes of implementing this Settlement.

## II.     PROCEDURAL BACKGROUND

13.     Defendant Flagstar Bank, N.A., f/k/a/ Flagstar Bank, FSB, is a Michigan-based federally chartered stock savings bank, headquartered at 5151 Corporate Drive, Troy, Michigan. New York Community Bancorp. Inc. is a Delaware corporation that is headquartered at 102 Duffy Avenue in Hicksville, New York. On December 1, 2022, New York Community Bancorp, Inc. merged with Flagstar Bancorp, Inc.[3] On September 23, 2023, NYCB unveiled a "refreshed logo

---

[3] *Press Release: New York Community Bancorp, Inc. Completes Acquisition of Flagstar Bancorp, Inc.*, NEW YORK COMMUNITY BANCORP, INC., https://ir.mynycb.com/news-and-events/news-releases/press-release-details/2022/NEW-YORK-COMMUNITY-BANCORP-INC.-COMPLETES-ACQUISITION-OF-FLAGSTAR-BANCORP-INC/default.aspx   (last visited May 9, 2024).

and brand identity signaling the unification" of the companies "under the Flagstar name."[4]

14.     Plaintiffs are present or former customers or employees of Flagstar who entrusted Flagstar with their highly confidential and personally-identifiable information ("PII"),[5] which was then exfiltrated and compromised in either or both of the Data Breaches announced by Flagstar on March 5, 2021 (the "First Data Breach") and June 17, 2022 (the "Second Data Breach") (collectively, the "Data Breaches"), the facts of which are explained in detail in the Fifth Amended Consolidated Class Action Complaint ("5AC"). ECF No. 112. Below, we provide important context on the procedural background of this case.

### A.     The First Data Breach–Procedural Background

15.     On March 25, 2021, Plaintiffs Philip Angus and Mark Wiedder filed the first of five related cases that were brought in the Eastern District of Michigan, and which were consolidated before the Honorable Arthur J. Tarnow. Plaintiffs filed their

---

[4]     *About Flagstar*, WWW.FLAGSTAR.COM, *available at* https://www.flagstar.com/about-flagstar.html (last visited May 9, 2024).

[5] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security number, passport number, driver's license number, financial account number).

Consolidated Class Action Complaint against Flagstar in June 2021, followed shortly thereafter by a Second Consolidated Class Action Complaint in August 2021. This First Data Breach was the subject of *Angus et al. v. Flagstar Bank, N.A.*, Case No. 2:21-cv-10657 (E.D. Mich.) ("*Flagstar I*"). On July 30, 2021, Judge Tarnow appointed John A. Yanchunis of Morgan & Morgan as Interim Lead Counsel and Jeffrey S. Goldenberg, Gary E. Mason, Charles E. Schaffer, M. Anderson Berry, Brian D. Flick, and Bryan Bleichner as members of an Executive Committee. (ECF No. 33).[6]

16.     On September 21, 2021, the Court entered an Order staying the case pending the disposition of a proposed settlement in related cases pending against Accellion and Flagstar in the Northern District of California, which were consolidated before the Honorable Edward J. Davila and captioned *In re Accellion, Inc. Data Breach Litigation*, Case No. 21-cv-01155 (N.D. Cal.).

17.     Many procedural machinations followed thereafter, however proposed Class Counsel believe it important to highlight a few key occurrences during this time. ***First***, prior to the appointment of interim class counsel in the *In re Accellion* matter, Flagstar purported to reach a $5.9 million settlement with different plaintiffs' counsel and moved for preliminary approval on September 3, 2021. After Judge

---

[6] On February 16, 2022, this case was reassigned from District Judge Arthur J. Tarnow to District Judge Matthew F. Leitman pursuant to Administrative Order 22-AO-007. *See* ECF Text-Only Order of 02/16/2022.

Davila appointed interim class counsel—a different set of lawyers than those that had attempted to settle the case—interim class counsel were tasked with evaluating the $5.9 million settlement to determine whether it was fair, reasonable, and adequate. Interim class counsel concluded that the settlement did not meet the Ninth Circuit's standard for pre-certification settlements, and recommended the court reject the settlement. Although Flagstar urged the court to approve the $5.9 million settlement (with support from plaintiffs' counsel that had sponsored the deal), Judge Davila rejected the request, returning the parties to mediation.

18.     *Second*, following that settlement's failure, a mediation with the Hon. Suzanne H. Segal (Ret.) was held on August 1, 2023. Attending that mediation were, among others, appointed interim class counsel in the *In re Accellion* matter—as well as John Yanchunis, who had previously been appointed Interim Lead Counsel by the *Flagstar I* Court. This mediation resulted in an impasse.

19.     As a result of the failed settlement efforts in the Northern District of California, the *Flagstar I* case had been then stayed for nearly two years until August 2023, when the claims asserted against Flagstar were severed from *In re Accellion* and transferred back to the Eastern District of Michigan with the consent of the Parties. In August 2023, the stay in this Court was lifted and Plaintiffs were ordered to file a Third Consolidated Class Action Complaint, which they did in September

2023. In connection therewith, counsel retained an expert to search for evidence that information exfiltrated during the Data Breaches was available on the dark web.

20.    On October 30, 2023, Flagstar moved to dismiss Plaintiffs' claims, arguing that Plaintiffs lacked Article III standing and that their claims failed on the merits.

21.    On April 19, 2024, after a hearing on the motion, the Court denied Flagstar's motion to dismiss Plaintiffs' claims for damages based on a lack of Article III standing and further allowed Plaintiffs to pursue injunctive relief to remedy Flagstar's failure to encrypt Plaintiffs' PII and delete Plaintiffs' PII after Flagstar no longer had a legal obligation or need to maintain it.[7] The Court denied the remainder of Flagstar's motion without prejudice and ordered Plaintiffs to file a Fourth Amended Consolidated Class Action Complaint by May 13, 2024, with a 60-day choice of law discovery period to follow.[8] On May 13, 2024, Plaintiffs Angus, Wiedder, Garcia, Burdick, Harter, Meis, Kelley, Martin, Dore, A. Kelly, K. Kelly, Moniz, and Ringling filed their Fourth Consolidated Class Action Complaint, (ECF No. 88). The Parties then engaged in a 60-day period of choice of law discovery, and Flagstar renewed its motion to dismiss.

---

[7] ECF No. 86 at 2.
[8] *Id.*

22.    Following a February 12, 2025 in-person hearing, on March 27, 2025, this Court ruled on the motion, denying Flagstar's motion to dismiss Plaintiffs' breach of implied contract claim, invasion of privacy claim based on a public disclosure of private facts theory, breach of confidence claim and California Plaintiffs' UCL, CCPA, and CCRA claims. ECF No. 103.

### B.    The Second Data Breach–Factual Background

23.    Between December 3 and December 4, 2021, cyber criminals infiltrated Flagstar's corporate network and accessed highly sensitive customer information stored on its servers, including full names and Social Security numbers for approximately 1.5 million customers (the "Second Data Breach").

24.    Specifically, cyber attackers began infiltrating Flagstar's network as early as November 22, 2021. *See In re Flagstar December 2021 Data Security Incident Litigation*, Case No. 2:22-cv-11385, ECF No. 87 at 4 (E.D. Mich.) ("*Flagstar II*"). The attackers exfiltrated significant amounts of PII from Flagstar's network over the two-day period in December. *Id.* The cyber attackers demanded ransom for return of the stolen data. After engaging in ransom negotiations through a hired external cybersecurity professional, Flagstar agreed to pay the ransom. In exchange for the ransom payment, Flagstar requested, among other things, "the complete deletion of all data acquired from Flagstar's network." *Id.* at 5. Flagstar completed payment on December 31, 2021. *Id.*

13

25.    However, Flagstar did not publicly acknowledge the Second Data Breach until June 17, 2022, when it posted a press release on its website.[9]

**C.    The Second Data Breach–Procedural Background**

26.    Named plaintiffs began filing individual suits against Flagstar related to the Second Data Breach in June 2022, soon after Flagstar publicly announced the breach. This Second Data Breach was the subject of *In re Flagstar December 2021 Data Security Incident Litigation*, Case No. 2:22-cv-11385 (E.D. Mich.) ("*Flagstar II*").

27.    On May 24, 2023, the *Flagstar II* Court appointed John Yanchunis and Norman Siegel as Interim Co-Lead Counsel, as well as a Plaintiffs' Executive Committee made up of E. Powell Miller, Rachel K. Tack, Danielle L. Perry, Michael Reese, and Jamisen A. Etzel; and David H. Fink as Interim Liaison Counsel. *See Flagstar II*, ECF No. 45, PageID.518–520.

28.    Several cases were consolidated and on June 23, 2023, Plaintiffs John Scott Smith, Christopher P. Kennedy, Erin Tallman, Mark Wiedder, Michael McCarthy, Rafael Hernandez, William Worton, Hassan Nasrallah, Nathan Silva, Laurie Ewing Scanlon, Everett Turner, and Allie McLaughlin filed an Amended

---

[9]    *Customer Data Information Center*, WWW.FLAGSTAR.COM, https://www.flagstar.com/customer-support/customer-data-information-center.html (last visited June 15, 2023).

Consolidated Class Action Complaint asserting eighteen causes of action against Flagstar relating to the Second Data Breach.

29.    On July 24, 2023, Flagstar moved to dismiss the *Flagstar II* Plaintiffs' claims, raising a "factual attack" to Article III standing and arguing Plaintiffs failed to state a claim. After a period of targeted discovery regarding Flagstar's factual attack—including document production, interrogatories, and depositions—the Parties briefed the motion and the Court held a hearing on September 23, 2024. On September 30, 2024, the Court held that Plaintiffs had Article III standing, crediting evidence demonstrating "the risk that the cyber attackers intend to use Plaintiffs' PII in the future." *Flagstar II*, ECF No. 87, PageID.1932. The Court also denied Flagstar's motion with respect to Plaintiffs' claim under California's Consumer Privacy Act, Cal. Civ. Code § 1798.150. In ruling on the CCPA claim, the Court rejected Flagstar's arguments that Plaintiffs failed to state a claim or follow the CCPA's pre-suit notice requirement, explaining "courts have found allegations that are very similar to what Plaintiffs allege here as sufficient[.]" *Id.* at PageID.1941–1943. The Court, however, dismissed all of Plaintiffs' non-CCPA claims. *Id.* at PageID.1947–1948.

### III.   GLOBAL SETTLEMENT NEGOTIATIONS

30.     On March 4, 2025, the Parties jointly sought stays in both *Flagstar I* and *Flagstar II*, which were granted shortly thereafter, to pursue possible resolution. *See* ECF Nos. 104, 105; *Flagstar II*, ECF Nos. 98, 99.

31.     The Parties engaged in arm's-length settlement negotiations beginning in April 2025, before former United States District Court Judge Gerald E. Rosen. In addition to direct communications between counsel, the Parties engaged in two, all-day, in-person mediation sessions on July 18, 2025, and August 8, 2025. At the conclusion of the session on August 8, 2025, the Parties accepted a mediator's proposal and executed a binding term sheet.

32.     The Parties exchanged both formal and informal discovery leading into the negotiations that allowed proposed Class Counsel to fairly evaluate the strengths and weaknesses of the case, including information relating to (i) when and how the Data Breaches occurred and (ii) the number of individuals impacted by each of the Data Breaches. In addition to each side's legal and factual argument, a consideration in the negotiations was Flagstar's current financial position.

33.     Specifically, in connection with the mediation, Flagstar provided proposed Class Counsel with financial information demonstrating that:

      a.   It has experienced six consecutive quarters of negative net income dating back to 2023, including: in 2023, a net loss of $79 million; in

2024, net losses of $1.1 billion; in the first quarter of 2025 a net loss of $100 million; and in the second quarter of 2025 a net loss of $70 million.

b. In 2024, total deposits decreased by $5.7 billion or 7%, and Flagstar disclosed in its 2024 10-K Annual Report, "[L]arge-scale withdrawals of brokered or institutional deposits could require and has required us to pay significantly higher interest rates on our retail deposits or on other wholesale funding sources, which has an adverse impact on our net interest income and net income."

c. The first quarter of 2025 saw a $2.0 billion decrease in deposits and the second quarter saw a further decrease of $4.2 billion.

d. At the end of 2024, Flagstar traded at approximately 0.55x of tangible book value, compared to 1.84x for Category IV banks and 1.66x for banks with assets between $50 - $100 billion. In July 2025, Flagstar traded at $12.05 per share—less than half of what it would be if its share price was the same tangible book value as its peer group.

e. From January to March 2024, Moody's downgraded Flagstar's long-term issuer rating six levels from Baa3 (investment grade) to B3 (junk bond status). Although Moody's most recently gave Flagstar a rating of B1, Moody's still describes this rating as "non investment grade" and

"considered speculative and are subject to high credit risk." Fitch Ratings most recently assigned Flagstar a credit rating of BB. Fitch Ratings on its "Ratings Scales" page describes a rating of "BB" as "[s]peculative" and indicating "an elevated vulnerability to default risk, particularly in the event of adverse changes in business or economic conditions over time[.]"

f. In addition, in 2024, Flagstar sold off its mortgage servicing right assets and mortgage warehouse and mortgage servicing and third-party origination businesses. As a result of that decision, Flagstar had to lay off a number of its full-time employees. It has also closed many retail branches of the bank, as a cost-saving measure.

34. Flagstar's financial condition, as outlined above, was an additional factor in proposed Class Counsel's analysis in concluding that the settlement was fair, reasonable, and adequate, and in the best interests of the Class to resolve the case at this time.

A. **The Settlement Class**

35. The Agreement defines the "Settlement Class" as "[a]ll persons in the United States whose personally identifying information ("PII") was impacted by either or both of the two Data Breaches Flagstar experienced in 2021, as reflected in the Class List. Ex. A ¶ 2.34. Excluded from the Settlement Class are: (1) Flagstar,

18

any entity in which Flagstar has a controlling interest, and Flagstar's officers, directors, legal representatives, Successors, Subsidiaries, and assigns; (2) any judge, justice, or judicial officer presiding over the Action and the members of their immediate families and judicial staff; and (3) any individual who timely and validly opts out of the Settlement Class. *Id.*

### B.    The Settlement Benefits Conferred on the Settlement Class

36.    Under the proposed Settlement, Flagstar will pay a non-reversionary amount of $31,500,000 into a Settlement Fund to pay for: (1) Notice Costs; (2) Administrative Costs; (3) Service Awards approved by the Court; (4) Attorneys' Fees and Expenses approved by the Court; and (5) Settlement benefits for the Settlement Class as provided for in the Consumer Settlement Benefits Plan ("CSBP") (Ex. A-1) as approved by the Court. Ex. A ¶ 3.2.

37.    The specific benefits available to Settlement Class Members are detailed in the Consumer Settlement Benefits Plan (Ex. A-1), and include:

- **Reimbursement of Documented Monetary Losses.** All Settlement Class Members may submit a Claim Form for reimbursement of documented Monetary Losses fairly traceable to the Data Breaches up to $25,000 per individual. Monetary Losses may include, without limitation, unreimbursed losses relating to fraud or identity theft; professional fees including attorneys' fees, accountants' fees, and fees for credit repair services; costs associated with freezing or unfreezing credit with any credit reporting agency; credit monitoring costs that were incurred on or after the Data Breaches through the date of Claim submission; and miscellaneous expenses such as notary, fax, postage, copying, mileage, and long-distance telephone charges. Ex. A-1, CSBP ¶ 2.

19

- **Credit Monitoring.** All Settlement Class Members may also submit a Claim for three years of Credit Monitoring which will include at least three bureau credit monitoring and $1 million in identity theft insurance protections. *Id.* ¶ 3.

- **California Statutory Payment.** In addition to, or in the alternative to, making Claims for Documented Monetary Losses and/or Credit Monitoring, Settlement Class Members who resided in California at the time of the Data Breaches may elect to receive a statutory cash payment of up to $100 on a claims-made basis ("California Statutory Payment"). To be eligible to receive the California Statutory Payment, California Settlement Class members must submit their name, address, Unique Class Member ID number, and an attestation under penalty of perjury that they were residents of California at the time of the Data Breaches. Unless specifically requested by the Settlement Administrator, California Subclass Members need not submit any proof-of-residency documentation. This benefit may be stacked with any claim for Documented Monetary Losses and/or a Residual Cash Payment. *Id.* ¶ 4.

- **Residual Cash Payment.** All Settlement Class Members may also submit a claim for a Residual Cash Payment. The amount of this benefit shall be determined pro rata based on the amount remaining in the Settlement Fund following payment of the Attorneys' Fees and Expenses, Service Awards, Administrative Costs, Credit Monitoring costs, Claims for reimbursement of documented Monetary Losses, and claims for California Statutory Payments. The Residual Cash Payment shall not exceed $599 per individual. *Id.* ¶ 5.

38.     Settlement Class Members seeking any of these benefits must complete and submit either a written or online Claim Form to the Settlement Administrator, postmarked or electronically submitted on or before the Claims Deadline. *Id.* ¶ 15. Settlement Class Members with Monetary Losses must submit documentation supporting their Claims. *Id.* ¶ 2.

39.     In the event that the aggregate amount of payments for unreimbursed documented Monetary Losses and California Statutory Payments exceeds the remaining amount in the Settlement Fund after payment of Attorneys' Fees and Expenses, Service Awards, Administrative Costs, and Credit Monitoring services, then each Settlement Class Member's Claim for documented Monetary Losses and California Statutory Payments shall be proportionately reduced on a pro rata basis, and there will be no Residual Cash Payment. *Id.* ¶ 16.

40.     To the extent any money remains in the Settlement Fund more than one hundred and fifty (150) days after the distribution of Settlement payments to the participating Settlement Class Members, or thirty (30) days after all reissued Settlement checks are no longer negotiable, any remaining money shall be used to purchase an extension of the Credit Monitoring services for those who submitted an approved Claim for that relief, and, in the event the amount remaining is insufficient to purchase any additional Credit Monitoring term, awarded to the designated and Court-approved cy près recipients. *Id.* ¶ 13.

## C.     The Notice and Claims Process

41.     Proposed Class Counsel have retained, and request that the Court appoint, Eisner Advisory Group LLC ("EAG") as Settlement Administrator to provide notice to Settlement Class Members, process claims, and otherwise administer the Settlement.

42.     The Notice Plan designed by EAG satisfies the "best notice practicable" standard pursuant to Rule 23 of the Federal Rules of Civil Procedure.

43.     Contact information is available for virtually all Settlement Class Members on the Class List.

44.     EAG has formulated a robust Notice Plan that encompasses direct summary postcard notice to the 2,187,170 Settlement Class Members via U.S. mail. *See* Ex. A § 9; Ex. A-1 ¶ 6; Ex. C ¶ 10. Specifically, where physical addresses have been provided for Settlement Class Members, Postcard Notices shall be sent, with an attached "tear off" claim form with prepaid postage for those who wish to make claims that do not require documentation, *e.g.*, Claims for Credit Monitoring, a Residual Cash Payment, and/or California Statutory Payment. Ex. A-1 ¶ 6. Where email addresses have been provided for Settlement Class Members, Email Notice shall also be sent, in addition to the Postcard Notice. *Id*

45.     Moreover, the Long Form Notice will be posted on the Settlement Website, along with other important documents such as the Settlement Agreement, and a toll-free help line will be available to answer Settlement Class Members' questions. Ex. C ¶ 16. The individual notice "will provide the best notice that is practicable . . . follows the guidance set forth in the Manual for Complex Litigation 4th Ed. and FJC guidance, and exceeds the requirements of due process . . . ." *Id*. ¶ 21. In proposed Class Counsel's experience, and according to EAG, the reach of the

Notice Plan meets that of other court-approved notice programs, and has been designed to meet due process requirements, including the "desire to actually inform" requirement. *Id.* The Notice Plan is thus the best notice practicable under the circumstances of this case. *Id.*

46.     The claims process similarly draws upon the most up-to-date techniques to facilitate participation, including the ability to submit claims electronically on the Settlement Website or by mail.

### D.     Opt-Outs and Objections

47.     The Settlement provides standard provisions allowing individuals to opt-out of the Settlement or object to the Settlement within forty-five (45) days of the Notice Date. The opt-out provisions require individuals to provide basic information, and opt-outs can be submitted by U.S. Mail. Similarly, the provisions related to objections allow any Settlement Class Member to object to any component of the Settlement. Ex. A ¶¶ 2.23–2.24.

### E.     Service Awards, Attorneys' Fees, and Expenses

48.     Proposed Class Counsel will separately move the Court for an order awarding attorneys' fees of up to one-third of the Settlement Fund, or $10,500,000, and reimbursement of Expenses incurred in prosecuting and settling the Action not to exceed $500,000 to be paid exclusively from the Settlement Fund. *See* Ex. A § 18. Class Counsel will also request Service Awards of $2,500 for Settlement Class

Representatives, and two former named Plaintiffs in the consolidated Action, to be paid exclusively from the Settlement Fund. *Id*. § 17. Flagstar agrees not to oppose any request to the Court for Service Awards. *Id*. Both the application for Attorneys' Fees and Expenses, and the application for service awards will be filed at least twenty-one (21) days before the Objection Deadline. *Id.* ¶¶ 17.1, 18.1.

49.    During the negotiations, attorneys' fees were not discussed in any manner until the Parties had reached agreement on the material terms of the settlement, including the payment of the Settlement Fund. There is no "clear sailing" clause in the Agreement.

### F.    Releases

50.    In exchange for the benefits provided under the Settlement, the Settlement Class will release Flagstar from claims that relate to or arise from the Data Breaches or the facts alleged in the Action. The releases are detailed in the Settlement Agreement. Ex. A. ¶¶ 2.29, 2.30, 13.1. Proposed Class Counsel believes the releases are appropriately tethered to the claims that were presented in the Action and therefore appropriate consideration in exchange for the substantial class relief provided by the Settlement.

### IV.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

51.    Based on our experience and knowledge of the litigation, as well as our experience in other consumer class actions, we believe the proposed Settlement is a

fair, reasonable, and adequate result, and in the best interest of the Settlement Class.

If approved, the Settlement will deliver substantial relief specifically tailored to the

types of harm often incurred as a result of criminal data breaches. Reimbursement

for Documented Monetary Losses of up to $25,000, three years of Credit Monitoring

services; California Statutory Payments of up to $100, and Residual Cash Payments

of up to $599 are all available under the Settlement, and address the types of issues

that proposed Class Counsel and Settlement Class Representatives sought to redress

through this litigation.

52.     Subject to Court approval, the Settlement Fund will also pay for a notice

and   administration   program,   Service   Awards   to   the   Settlement   Class

Representatives, and Attorneys' Fees and Expenses.

53.     Based on proposed Class Counsel's experience in other data breach

cases, the funds available to Class Members are tailored to address the losses

stemming from the Data Breaches. When a victim incurs out-of-pocket expenses

relating to a data breach, it is typically associated with seeking advice about how to

address the breach (e.g., paying for professional services), paying incidental costs

associated with identity theft or fraud (e.g., overdraft fees or costs for sending

documents by certified mail), or taking mitigative measures like paying for credit

monitoring or credit freezes. As such, the documented out-of-pocket expenses

associated with a data breach are generally relatively modest, and rarely exceed

several hundred dollars. When victims spend more than this amount, it is typically associated with paying for professional services such as accountant or attorneys' fees.

54.    The Settlement must also be viewed against the significant risks to Plaintiffs had they continued to litigate the Action. While Plaintiffs are confident in the merits of their theory of liability and ability to prove the claims of the absent class members, there remain significant obstacles to a class-wide judgment in favor of the class on liability and damages. Additional litigation would be complex, costly, and likely continue for several years with no guarantee of relief. A settlement now allows Settlement Class Members to obtain relief without high administrative burdens.

55.    Likewise, the financial realities demonstrated by Flagstar militate strongly in favor of a resolution now, at the amount negotiated, as a hedge against the possibility of collectability concerns in the future.

56.    Moreover, the $31,500,000 Settlement Fund obtained on behalf of a Settlement Class of 2,187,170 individuals, amounts to $14.40 per person, a more than adequate outcome for a data breach settlement of this size. For example, below are orders within the Sixth Circuit granting preliminary or final approval of common fund settlements in data breach cases arising from cyberattacks, none of which achieves the **$14.40** per Settlement Class Member achieved in this action:

- <u>$10.03 per class member</u>: *In re CorrectCare Data Breach Litig.*, No. CV 5:22-319-DCR, 2024 WL 1854711 (E.D. Ky. Apr. 29, 2024) ($6,490,000 fund for 646,701 class members).

- <u>$6.18 per class member</u>: *Thomsen v. Morley Companies, Inc.*, 639 F. Supp. 3d 758 (E.D. Mich. 2022) (granting preliminary approval) ($4,300,000 fund for 694,679 class members).[10]

- <u>$4.32 per class member</u>: *In re Wright & Fillipis, LLC Data Security Incident Litig.*, No. 2:22-cv-12908-SFC, 2024 WL 3083436 (E.D. Mich. June 20, 2024) (granting final approval) ($2.9 million fund for approximately 670,763 individuals).[11]

- <u>$2.88 per class member</u>: *In re Sonic Corp. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2807, 2019 WL 3773737 (N.D. Ohio Aug. 12, 2019) (granting final approval).[12]

57.     Likewise, for a data breach case of this size, with more than a million individuals at issue, the per person average for settlements across the country is often far lower than the $14.40 obtained here, even when controlling for the presence of

---

[10] The class size is stated in the order; the fund amount, which is not, was stated in the motion for final approval.  *See* 1:22-cv-10271-TLL-PTM (ECF No. 31, PageID.2110).

[11] The class size and fund amount are stated in the motion for final approval.  *See* 2:22-cv-12908-SFC-EAS (ECF No. 47, PageID.2710).

[12] This action involved credit cards, not Social Security numbers.

Social Security Numbers (SSNs) in the compromised data set, as seen in the chart below:

| Case Name | Class Size | PII at Issue | Settlement Amount | Per Person |
|---|---|---|---|---|
| *Cochran v. Kroger and Accellion*, 5:21-cv-1887 (N.D. Cal.) | 3,800,000 | Names, dates of birth, Social Security numbers, health insurance information, | $5,000,000 | $1.31 |
| *Hightower v. Receivables Performance Mgmt. LLC,* No. 2:22- cv-01683 (W.D. Wash.) | 3,700,000 | Names, Social Security numbers | $5,600,000 + credit monitoring | $1.51 |
| *In re: Arthur J. Gallagher Data Breach Litig.*, No. 1:22-cv-00137 (N.D. Ill.) | 3,492,654 | PII including SSNs and PHI | $21,000,000 | $6.01 |
| *Heath v. Keenan & Associates*, No. 24STCV03018 (Cal. Super. LA) | 1,780,595 | PII & PHI including SSNs | $14,000,000 | $7.86 |
| *In re MCG Health Data Security Issue Litigation*, No. 2:22-cv-849 (D. Wash.) | 1,100,000 | PII including SSNs and PHI | $8,800,000 | $8.00 |

58.    Based on the factual record and the briefing and argument on legal issues, proposed Class Counsel believe the Settlement is in the best interests of the Settlement Class.

59.    Likewise, there is no indication that there are any conflicts between the Settlement Class Representatives and the Settlement Class. Rather, Settlement Class Representatives claims are substantially similar to the claims of the Settlement Class. Each of them was impacted by one or both of the Data Breaches due to the unauthorized access to their personal information. Moreover, in crafting the Settlement, we took care to ensure that the relief was allocated commensurate to the value of each Settlement Class Member's respective claims—those that suffered a greater loss will be able to make a proportionately larger claim than those that did not, and those in California with additional statutory rights can recover for those claims.

60.    Settlement Class Representatives' and Class Members' claims arise from the impact to their PII as a result of the Data Breaches. Settlement Class Representatives actively participated in the case by assisting with the initial and amended complaints and approving this Settlement.

61.    In light of the totality of the circumstances, the Court should conclude that the Settlement as described in the Settlement Agreement is fair, reasonable, and adequate and likely to achieve final approval, and therefore notice should issue to the class.

We declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED this Wednesday, October 1, 2025 in the United States of America.

_____
Norman E. Siegel

_____
John A. Yanchunis